INTEL CORPORATION, a Delaware corporation, Plaintiff and Counterclaim Defendant,

v.

VIA TECHNOLOGIES, INC., a Taiwan corporation, and VIA Technologies, Inc., a California corporation, Defendants and Counterclaim Plaintiffs.

No. C 99–03062 WHA (JL).

United States District Court, N.D. California.

Oct. 11, 2000.

Henry A. Petri, Jr., John F. Lynch, Arnold White & Durkee, Houston, TX, James F. Valentine, Laura Lee Engurasoff, Howrey Simon Arnold & White, LLP, Menlo Park, CA, for plaintiff.

Robert P. Feldman, Susan Creighton, Leo Cunningham, Vera M. Elson, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, John S. Ferrell, Carr & Ferrell LLP, Palo Alto, CA, for defendants.

## ORDER RE: MOTION TO MODIFY PROTECTIVE ORDER

LARSON, United States Magistrate Judge.

### INTRODUCTION

The motion of Plaintiff Intel Corporation ("Intel") to modify the stipulated Protective Order came on for hearing June 7, 2000. James Valentine, HOWREY, SIMON, ARNOLD, WHITE, appeared on behalf of Intel. Rodney Strickland, WILSON, SONSINI, GOODRICH & ROSATI, appeared on behalf of VIA TECHNOLOGIES, INC. ("VIA"). A sealed evidentiary hearing, at which Ms. Isabella Fu, in-house counsel for Intel testified, was held after oral argument on June 7, 2000.

### BACKGROUND

This is a suit for patent infringement assigned to Hon. William H. Alsup and referred to this Court for discovery matters. In its complaint filed June 23, 1999, Intel alleges infringement of four patents by VIA products. VIA's answer filed on April 24, 2000, denies infringement of Intel's patents, asserts several affirmative defenses, and counters with an anti-trust claim. Judge Alsup set a trial date of April 2, 2001 and a discovery cut-off of January 16, 2001.

The parties negotiated the terms of a Protective Order. Intel originally proposed granting access to all types of confidential information to in-house counsel, but VIA objected. The parties resolved to settle this issue on a motion by Intel before this Court.

The stipulated Protective Order, which denied in-house counsel access to any class of confidential information, was signed by all parties and submitted to Judge Alsup on April 27, 2000, who approved it on May 5th.

The Protective Order established two classes of information: Confidential Material and Highly Confidential—Attorney's Eyes Only Material. The Protective Order does not permit disclosure of either type of material to in-house counsel of either party, but the Order provides that Intel will file a motion to modify the Order to allow access to both classes of information to one in-house counsel from Intel. According to the provisions of the Protective Order, if Intel's Motion to Modify the Protective Order is granted, the Protective Order is automatically amended to permit one in-house counsel from each party to have access to the information. It is further stipulated that this attorney cannot be "engaged in product planning or patent prosecution" and may not "communicate with or advise any persons engaged in product planning or patent prosecution." *See Stipulated Protective Order at 4:20–24.*

## THE MOTION AND EVIDENTIARY HEARING

Intel's Motion to Modify Protective Order was filed May 3, 2000. VIA filed an Opposition on May 17th. Intel filed a Reply Memorandum on May 24th. On June 1st. VIA filled a Supplemental Submission claiming that Intel had denied VIA the opportunity to obtain evidence regarding Ms. Fu's involvement in competitive decisionmaking.

Intel seeks to modify the Protective Order to grant access to CONFIDENTIAL and HIGHLY CONFIDENTIAL material to Ms. Isabella Fu, Senior Counsel in Intel's in-house litigation department. Relying on *Brown Bag Software v. Symantec, infra,* Intel contends that its need to access confidential information outweighs the risk of inadvertent disclosure of VIA's confidential information to a competitor. According

to Intel, Ms. Fu must have access to all relevant information learned through discovery to direct litigation on Intel's behalf and advise Intel on "all important decisions." *Intel Corp. Notice of Mot. and Mot. to Modify Protective Order* at 2:19–21. If Ms. Fu does not have access to such information, according to Intel, Plaintiff will be deprived of the effective assistance of its chosen counsel. Intel further asserts that the risk to VIA of inadvertent disclosure is minimal.

In opposition, VIA contends that it would suffer irreparable harm if its trade secrets were revealed to Intel. Asserting that VIA and Intel are direct competitors and that the confidential information protected by the Order involves directly competing products, VIA argues that information revealed to Intel could be used to Intel's competitive advantage. VIA claims that the risk of inadvertent disclosure outweighs Intel's need because Ms. Fu and her immediate supervisor are involved in competitive decisionmaking, which heightens the risk of disclosure.

The Court ordered an evidentiary hearing to evaluate the risk of inadvertent disclosure of confidential information and determine whether Ms. Fu is involved in competitive decisionmaking. Ms. Fu was present and testified at the June 7th hearing.[1] Intel proffered Ms. Fu's declaration (Ex. A to Intel Corp. Mot. to Modify Protective Order) as its direct examination, and counsel for VIA cross examined.

## ANALYSIS

### A. Protective Orders

■ Parties seeking discovery are entitled to all information "reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). Rule 26(c) of the Federal Rules of Civil Procedure authorizes courts to minimize the burden on a producing party by ordering "that a trade secret or

---

1. In a May 25, 2000 letter to Intel, VIA stated its intention to request an evidentiary hearing from this Court and requested Ms. Fu's presence at the hearing or in the alternative, to make Ms. Fu available for deposition. In response, Intel refused to make Ms. Fu available and wrote that any evidence VIA had about Ms. Fu should have been in the Opposition and that VIA's "eleventh hour fishing expedition ... smacks of sandbagging and gamesmanship." (Ex. B to Defendants' Supplemental Submission in Further Opposition to Intel's Motion to Modify Protective Order).

other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way." Fed. R.Civ.Pro 26(c). The party seeking a protective order bears the burden of showing good cause for the order to issue. Fed.R.Civ.Pro. Rule 26.

■ Intel and VIA have stipulated to the Protective Order, which Intel now seeks to modify by moving for disclosure of confidential documents beyond the conditions of the protective order. The party opposing modification generally bears the burden of showing good cause for continuing the protection. *See Beckman Industries, Inc. v. International Ins. Co.*, 966 F.2d 470, 475 (9th Cir.1992); *See also Kraszewski v. State Farm Gen. Ins. Co.*, 139 F.R.D. 156, 159 (N.D.Cal.1991). In *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir.1992), then a case of first impression, the Ninth Circuit established in balancing that, comparing "the risk of inadvertent disclosure of trade secrets to a competitor, against the risk ... that protection of ... trade secrets impaired prosecution [of the discovering party's] claims."

■ Accordingly, because it seeks disclosure of information that would otherwise be confidential, Intel bears the burden of establishing a sufficient need for the information which outweighs the risk of injury to VIA. *See Brown Bag*, 960 F.2d at 1470 (motion to modify protective order was denied because the moving party "failed to demonstrate how the protective order actually could have or did prejudice its case."); *see also A. Hirsh, Inc. v. United States*, 657 F.Supp. 1297, 1303 (C.I.T.1987).

B. Burden of Good Cause

■ To modify a protective order a party must establish good cause by demonstrating how the protective order will prejudice the party's case. *See Brown Bag*, 960 F.2d at 1472. In *Brown Bag*, a Party's contention that in-house counsel needed access to confidential information to manage the case was held to be insufficient to overcome the risk of inadvertent disclosure, even where outside counsel had withdrawn from the litigation. *See id.* at 1471. The protective order must actually prejudice presentation of the moving party's case, not merely increase the difficulty of managing the litigation.

■ Where, because of the technical nature of a case, the specialized knowledge of in-house counsel was necessary to supervise the litigation, good cause was found to outweigh the risk of inadvertent disclosure and permit access of in-house counsel to confidential information. *See Carpenter*, 132 F.R.D. at 28. Courts have also found good cause where other extenuating circumstances exist which would cause hardship to a party. *See U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed.Cir.1984), in which the Federal Circuit permitted in-house counsel access to confidential information where the party seeking disclosure had no outside counsel, the litigation was "extremely complex and at an advanced stage," and both parties agreed that in-house counsel was not involved in competitive decisionmaking. *Id.*

Intel asserts in the case at bar that because Ms. Fu is responsible for directing the litigation on behalf of Intel, she must have access to all information, otherwise "Intel will be deprived of the effective assistance of its chosen counsel." *Intel's Motion* at 3:3–4. In her declaration, Ms. Fu states:

> I am the leader of Intel's litigation team in this litigation. It is my job to advise Intel about this case and to manage Intel's outside counsel. In this capacity, I need access to all information produced by VIA and designated under the protective order [sic] so that I can understand the issues, assess the strength of the case, and plan strategy.... Without access to such information, it will be impossible for me to effectively advise Intel or manage outside counsel.

Fu Decl. ¶ 4.

Ms. Fu's stated need for access fails to establish the good cause required by *Brown Bag, Carpenter*, and *U.S. Steel*. Though Ms. Fu herself may need the information to advise Intel and manage the case, she does not allege that Intel's ability to litigate through outside counsel will be impaired. *See U.S. Steel*, 730 F.2d at 1468; *see also Carpenter*, 132 F.R.D. at 28. In *Brown Bag*, no prejudice was found where outside counsel had

sufficient time and resources to review confidential materials and was presumably competent to evaluate the information. *See Brown Bag,* 960 F.2d at 1471.

Further, Ms. Fu graduated law school in 1991 and has not litigated cases since at least 1995 when she joined Intel. No demonstration of specialized knowledge has been made and her limited experience fails to support any claim that Ms. Fu is indispensible to the litigation. *See Carpenter,* 132 F.R.D. at 28.

The party seeking access must demonstrate that its ability to litigate will be prejudiced, not merely its ability to manage outside litigation counsel. *See A. Hirsh Inc.,* 657 F.Supp. at 1305 ("in view of retained counsel's competence, it is not clear how plaintiffs position will be prejudiced by excluding [in-house] counsel from access"). Requiring a party to rely on its competent outside counsel does not create an "undue and unnecessary burden." *Id.* The quality of the counsel representing Intel and the lack of any evidence indicating Intel will be prejudiced in prosecuting its case undermines Intel's contention that they have good cause to modify the Protective Order.

Intel's outside counsel is represented by Howrey, Simon, Arnold, & White ("Howrey"), the "largest intellectual practice in the world with more than 230 IP attorneys." *Press Release: Howery & Simon and Arnold, White, & Durke Vote in Favor of Merger* (Visited May 15th, 2000) <http://www.howrey. com/ mergerrelease. html>. The two firms that merged in 1999 to form Howrey held the number one and two spots in *IP Worldwide's* 1999 survey "Who Protect's the World's Most Valuable IP Rights?" *See id.* Further, Intel is pursuing a complaint against VIA in the International Trade Commission contesting infringement of the same four patents at issue in this case. *See In the Matter of Certain Integrated Circuit Chipsets and Products Containing Same,* Inv. No. 337–TA–428, 2000 ITC LEXIS 40 at *2 (I.T.C. Feb. 8, 2000). In that action, the Protective Order entered by the Administrative Law Judge prohibits access by in-house counsel to all information termed confidential business information. *See In the Matter of Certain Integrated Circuit Chipsets and*

*Products Containing Same,* Inv. No. 337–TA–428, 2000 ITC LEXIS 41 (I.T.C. Feb. 8, 2000). At the evidentiary hearing before this Court, Ms. Fu testified that this restriction made managing the case "difficult" but admitted that prosecution of the case was not impaired.

## C. Risk of Disclosure

An unacceptable risk of disclosure that cannot be adequately mitigated by a protective order is a factor in limiting access to confidential information. *See U.S. Steel Corp.,* 730 F.2d at 1468. The court in *Brown Bag* incorporated the holding of the court in *U.S. Steel* that the risk of potential inadvertent disclosure by counsel must be determined by "the facts on a counsel-by-counsel basis." *U.S. Steel,* 730 F.2d at 1468; *Brown Bag,* 960 F.2d at 1470. "Thus the factual circumstances surrounding each individual counsel's activities, association, and relationship with a party, whether counsel be inhouse or retained, must govern any concern for inadvertent or accidental disclosure." *U.S. Steel* at 1468.

The court in *U.S. Steel* held that where inhouse counsel is involved in "competitive decisionmaking" the risk of disclosure may outweigh the need for confidential information. *See U.S. Steel,* 730 F.2d at 1468; *see also Matsushita Elec. Indus. Co. v. United States,* 929 F.2d 1577, 1579 (Fed.Cir.1991) (applying U.S. Steel analysis). The term "competitive decisionmaking" was defined in *U.S. Steel* as "shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *U.S. Steel,* 730 F.2d at 1468 note 3.

Unrebutted statements made by counsel asserting that he does not participate in competitive decisionmaking, which the court has no reason to doubt, form a reasonable basis to conclude that counsel is isolated from competitive decisionmaking. *See Matsushita,* 929 F.2d at 1580. In her declaration, Ms. Fu states that in her role as Senior Counsel in the Intel litigation group, she manages "intel-

lectual property litigation as well as other general commercial litigation and legal disputes." Fu Decl. ¶ 2. Her involvement in intellectual property licensing is limited to "the extent that it resolves litigation or a legal dispute." *Id.* At the evidentiary hearing, however, it became evident that Ms. Fu is involved in types of decisionmaking that create an unacceptable risk of disclosure.

Ms. Fu's involvement in licensing through litigation constitutes competitive decisionmaking, because her advice and counsel necessarily affect licensing decisions. Ms. Fu testified that as Senior Counsel she is actively involved in negotiating the terms of licensing agreements as part of settling lawsuits. Ms. Fu estimates that two-thirds of intellectual property suits brought by Intel settle with licensing agreements as part of the settlement. In evaluating these agreements, Ms. Fu testified she evaluates the strength of the patent, Intel's products implicated by the patent, and competitors' products implicated by the patent. Ms. Fu further also testified that licensing agreements reached as part of settlements directly affected Intel's competitiveness in the market by affecting Intel's ability to sell products.

These activities would put Ms. Fu in the untenable position of having either to refuse to offer crucial legal advice at times or risk disclosing protected information. *See Brown Bag,* 960 F.2d at 1472. In the current litigation, licensing agreements, technical information, and marketing materials will be produced in discovery under seal. Ms. Fu's knowledge of technical aspects of VIA's products, VIA's licensing agreements, and marketing information would be directly relevant to her evaluation of licensing agreements of related products of Intel. Confidential information in this case may provide Intel a competitive advantage in negotiating related licenses in the future.

Concerns about this problem are exacerbated by Ms. Fu's interaction with general managers of Intel's business units and her immediate supervisor, Mr. Peter Detkin. The Federal Circuit in *Matsushita* noted that although it is irrelevant whether counsel has "regular contact with ... corporate officials who make ... competitive decisions,

"advice and participation" in "competitive decision making" " increases the risk of inadvertent disclosure. *Matsushita,* 929 F.2d at 1579 (quoting *U.S. Steel,* 730 F.2d at 1468 note 3).

In her testimony, Ms. Fu stated that when evaluating license agreements she reports directly to the general manager of the business unit most affected by the potential agreement. That general manager is responsible for approving or rejecting the license agreement. Any agreements which involve issues present in this lawsuit would entail Ms. Fu's giving advice based upon protected information. Though she may not purposely or knowingly evaluate an agreement in light of protected information, the difficulty in "lock[ing] up trade secrets in [her] mind" makes protections against inadvertent disclosure necessary. *Brown Bag,* 960 F.2d at 1471. As the court observed in *U.S. Steel,* "It is humanly impossible to control the inadvertent disclosure of some of this information in any prolonged working relationship." 730 F.2d at 1467.

Ms. Fu reports directly to Mr. Detkin, an Intel Vice-President involved in competitive decisionmaking who has been denied access to confidential information by courts in other similar cases. Ms. Fu will not be able to provide advice to Mr. Detkin on litigation matters related even tangentially to information she would have access to through discovery in this case. Ms. Fu's responsibilities to Mr. Detkin pose a serious risk of providing advice and counsel based upon protected information. In *Brown Bag,* the risk of inadvertent disclosure was significant where the in-house counsel worked for a small company and had duties related to marketing, contracts, and employment in addition to advising his employer on legal issues. *See id.* Here, though the risk of inadvertent disclosure is significantly less than in *Brown Bag,* the potential injury to VIA requires heightened care. *See Brown Bag,* 960 F.2d at 1471.

Ms. Fu has agreed to be bound by the Protective Order and not to keep copies of documents containing confidential information at her office. *See Fu Decl.* ¶ 5. Although this Court expressly credits the good faith

and integrity of Ms. Fu, her good intentions are insufficient to prevent inadvertent disclosure of confidential information because it is not possible for counsel to "lock-up trade secrets in [her] mind," as the Court in *Brown Bag,* observed. In that case, counsel's promise to maintain the confidentiality of the information coupled with a promise to keep the information locked up was held to be insufficient to offset the risk of inadvertent disclosure. *See id.* at 1471–72.

It is necessary to examine the role of in-house counsel in the corporation to determine whether knowledge of confidential information would place the counsel "in the untenable position of having to refuse his employer legal advise on a host of ... decisions lest he improperly or indirectly reveal ... trade secrets." *Brown Bag,* 960 F.2d at 1472. As the court in *U.S. Steel* observed, like retained counsel, in-house counsel are officers of the court and are bond by the same Code of Professional Responsibilities and are subject to the same sanctions. 730 F.2d at 1468. However, these self-executing obligations may not be sufficient to outweigh the risk of inadvertent disclosures.

### D. Potential Injury Resulting from Disclosure

Whether any amount of inadvertent disclosure of confidential information is acceptable is determined by balancing the potential injury to the party disclosing the confidential information against the need for access by the moving party. *See Brown Bag,* 960 F.2d at 1470. Even a seemingly insignificant risk of disclosure cannot be ignored due to the threat of significant potential injury. *See id.* The potential injury from inadvertent disclosure of VIA trade secrets in this case would be great, because the information could be used to duplicate VIA products, compete for its customers, or interfere with its business plan and thereby gain a competitive advantage in the marketplace. *See Via's Opposition to Intel's Motion to Modify Protective Order* at 2:25–28; 3:1–2.

Other courts have also recognized the potential for harm from inadvertent disclosure. *See, e.g., Akzo N.V. v. United States International Trade Commission,* 808 F.2d 1471, 1483 (Fed.Cir.1986), cert. denied, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987) ("Obviously, where confidential material is disclosed to an employee of a competitor, the risk of the competitor's obtaining an unfair business advantage may be substantially increased."); *F.T.C. v. Exxon Corp.,* 636 F.2d 1336, 1350 (D.C.Cir.1980) ("In-house counsel stand in a unique relationship to the corporation in which they are employed.... Their continued employment often intimately involves them in the management and operation of the corporation of which they are a part.").

The risk of potential injury is increased here because VIA represents the only unlicensed competitor of Intel for chipsets, and Intel is already the dominant player in this highly competitive market. Intel's history of dominance in this market compels a heightened concern for protecting VIA's confidential information.

In neither their original Motion nor their Reply Memorandum, does Intel attempt to argue that potential damage to VIA from disclosures would be minimal. Intel's suit against VIA alleges infringement of four Intel patents by VIA products. Intel and VIA are direct competitors, and confidential information about products that compete against each other in the market will be involved in this litigation. Some courts have found an increased risk of harm when information is being disclosed to a direct competitor. *See American Standard, Inc. v. Pfizer, Inc.,* 828 F.2d 734, 741 (Fed.Cir.1987). Disclosure of trade secrets to Intel of VIA's competing products and VIA's marketing information, strategies, and customer related data could have dire consequences for VIA.

### CONCLUSION AND ORDER

Intel has failed to meet its burden of showing good cause for modification of the Protective Order. Though it has alleged that Ms. Fu will have difficulty managing outside counsel if she is not offered access to confidential material, Intel has failed to make any showing that it will be prejudiced in presenting its best case. Even if Intel had succeeded in showing good cause, Ms. Fu's involvement in licensing agreements

and interactions with Plaintiff's business unit managers and with her supervisor, Mr. Detkin, involves her in competitive decisionmaking and presents an unacceptable risk of inadvertent disclosure. This risk, when evaluated in light of the tremendous potential harm to VIA, requires greater protection of confidential information by this Court. For these reasons, Intel Corporation's Motion to Modify Protective Order is DENIED.