**MEDIMMUNE, INC., Plaintiff,**

v.

**CENTOCOR, INC., et al., Defendant.**

**No. CIV.A. AW–02–1135.**

United States District Court,
D. Maryland,
Southern Division.

July 16, 2003.

---

Bradford J. Badke, Harvey Kurzweil, Brian Scott McGrath, Henry J. Ricardo, Lisa B. Deutsch, Dewey Ballentine LLP, New York City, James L. Thompson, Maury S. Epner, Miller, Miller, and Camby, Rockville, MD, Elliot M. Olstein, Carella, Byrne, Bain, Gilfillian, Cecchi, Stewart, and Olstein, Roseland, NJ, for MedImmune, Inc.

John Caleb Dougherty, Hugh Marbury, Natalie Fern Zaidman, Piper Rudnick LLP, Baltimore, MD, for Centocor, Inc.

Teresa Marie Corbin, Jayna R. Whitt, Howrey, Simon, Arnold, and White LLP, Menlo Park, CA, Jennifer A. Sklenar, Howrey, Simon, Arnold, and White LLP, Los Angeles, CA, Merritt Diane Westcott, Stephen E. Edwards, Howrey, Simon, Arnold, and White LLP, Houston, TX, Martin S. Himeles, Zuckerman Spaeder LLP, Baltimore, MD, Jimmy M. Shin, Vicki Susan Veenker, Shearman and Sterling, Menlo Park, CA, for Universities.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

Currently pending before the Court in this declaratory judgment action brought by MedImmune, Inc. ("Plaintiff") against Centocor, Inc. ("Centocor") and the Board of Trustees of Leland Stanford Junior University and Columbia University ("Universities")(collectively, "Defendants") are the following pending motions: (1) the motion to dismiss for lack of subject matter jurisdiction filed by the Universities [116]; (2) the motion to dismiss for failure to plead with sufficient particularity filed by the Universities [63, 64]; and (3) the motion to determine the party bearing the burden of proof filed by MedImmune [59].[1] The parties have also come before the Court for resolution of a lingering dispute regarding the provisions of the protective order that will govern discovery in the case.[2] The motions have been fully briefed. On July 10, 2003, the Court held a motions hearing at which time each side was afforded the opportunity to present argument on the motions. Upon consideration of the arguments made in support of, and opposition to, the motions, the Court makes the following determinations.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following is a summary of the facts necessary for adjudication of the pending motions. At the heart of this controversy is a patent which purports to cover "methods for producing functional immunoglobulin" and relates to the use of genetically altered cells to generate antibody molecules in the laboratory. The inventors

---

1. MedImmune also filed a Motion to File Surreply on the motion to dismiss for failure to plead with particularity [114]. Because the Court is ready to resolve the issue raised over the specificity in the Amended Complaint, the Court will DENY that motion as moot.

2. Although no formal motion has ever been filed regarding the protective order dispute, the parties have remitted to the Court numerous pleadings in which they propounded their arguments on the question of the wording of the protective order [61, 66, 72, 94, 96, 98].

("Applicants") applied to the United States Patent and Trademark Office ("PTO") on August 27, 1984. The PTO issued the Patent (" '715 patent") fourteen years later in 1998. The '715 patent has been assigned to the Universities. Prior to the issuance of the patent on November 10, 1992, Centocor obtained an exclusive license to the patent through an agreement with the Universities.[3]

In the years preceding the issuance of the patent, and prior to Plaintiff's awareness of it, Plaintiff was developing a drug called Synagis® which was approved by the Food and Drug Administration ("FDA") on June 18, 1998. Synagis® is a humanized monoclonal antibody that "targets a particular virus or source of disease." These monoclonal antibodies are artificially synthesized using recombinant DNA technology. Plaintiff began selling Synagis® in September 1998, after which it became one of Plaintiff's most important and successful pediatric drugs.

On May 19, 1999, Centocor contacted Plaintiff to inform it that Synagis® was infringing on the '715 patent. Plaintiff disagreed that Synagis® infringed on the patent but was concerned about the allegation. Plaintiff responded to Defendant by claiming that Synagis® did not infringe on the patent. After lengthy negotiations, Plaintiff eventually agreed to enter into a

Sublicense Agreement ("agreement" or "license") with Defendant in which it agreed to pay royalties to Defendant. After the formation of the agreement, Plaintiff claims, *inter alia*, that it came upon information which demonstrated that the patent was invalid and unenforceable because of, among other reasons, "inequitable conduct" by the Applicants during the patent application process before the PTO.

MedImmune filed the present declaratory judgment action in which in three counts it sought: (1) a declaration that MedImmune no longer owed royalties to Centocor because Synagis® was not a "licensed product" under the agreement, *i.e.*, absent the license it would not infringe on the patent held by Centocor; (2) a declaration that the patent was invalid and/or that Synagis® did not infringe on any valid patent; and (3) a declaration that the patent was unenforceable due to inequitable conduct. Defendants proceeded to file a mirror-image suit in the Northern District of California.[4] Both parties, in both actions, filed motions to dismiss and/or to transfer. In this action, Centocor argued that the case should be dismissed because MedImmune failed to join the Universities, who were, according to Centocor, necessary and indispensable parties to the action. MedImmune moved to dismiss the California action based on the "actual con-

---

**3.** In the agreement between Centocor and the Universities, the Universities granted a "world-wide" license to Centocor to make, use and sell Licensed Products (which are defined as any Licensed Patent Products or Licensed Non–Patent Products). The Universities reserved the right to use the Patent for not-for-profit research purposes. They also reserved the right to grant non-exclusive sublicenses to four companies with which they were negotiating such agreements, and they reserved the right to bring legal action against any alleged infringer. Among other rights granted to Centocor in the Agreement was the right, upon notice to the Universities, to sue any alleged infringer, subject to the Universi-

ties right to bring suit within three months of the notice. Centocor agreed to seek sublicenses with third parties. Centocor's right to sublicense was subject to this restriction: "Any proposed sublicense shall be subject to the prior written approval of Columbia, which approval shall not be unreasonably withheld." Agreement §§ 2, 3.1, 5.1, 12, 13.4, 13.5(d).

**4.** The complaint in the California action sought declarations that: (1) MedImmune infringes valid and enforceable claims of the '715 patent; (2) the claims of the '715 patent are valid; and (3) the claims of the '715 patent are enforceable.

troversy" requirement and on the "first-to-file" rule.

Because both parties have cited to the decision of Judge Breyer, and because the Universities have tended to misstate his holding, the Court feels compelled to recite his ruling in some detail. *See Centocor, Inc. v. MedImmune, Inc.,* 2002 WL 31465299, 2002 U.S. Dist. LEXIS 21109 (N.D.Cal.2002). The Court in California dismissed the action for the following three reasons. First, the Court held that there was no "actual controversy" between the parties as required by statute. The Universities have misstated the rationale that the Court used in finding there to be no "actual controversy". The Court did hold that there was no "reasonable apprehension" of suit. It did not do so, however, because of the license between the parties. Rather, the Court found that the likelihood of an infringement suit was low because of the Maryland action:

> Here, future infringement is not only uncertain but unlikely. Should the Maryland court rule in favor of MedImmune and declare that the '715 patent is invalid, MedImmune would be free to stop its royalty payments to Centocor because there would be no patent to infringe. Should the court rule in favor of Centocor, there is no indication that MedImmune would discontinue performance of its obligations under the sublicense and thus infringe the patent. In short, there is no immediate and real threat of infringement to justify declaratory relief at this time.

*Id.* at *3, 2002 U.S. Dist. LEXIS 21109 at *8–9. Second, the Court held that even if there was an "actual controversy", it would exercise its discretion to decline jurisdiction, finding that a second case between the same parties would serve no purpose. Third, the Court held the "first-to-file" rule applicable.

By Order and Opinion dated December 12, 2002, this Court denied Centocor's motion to dismiss, but ordered that the Universities be joined as necessary parties. The Court found that because the Universities retain certain rights in the patent, they were indeed necessary parties. The Court also held, however, that if the Universities for some reason could not be joined, the action would proceed because the Universities were not indispensable. MedImmune thereafter filed an Amended Complaint, naming the Universities as defendants.

## II. SUBJECT MATTER JURISDICTION

The Universities argue that the Court lacks subject matter jurisdiction over all the counts in the Amended Complaint. First, the Universities assert that the Court lacks subject matter jurisdiction over Count I because, although it is couched as a declaratory judgment claim, there is no "arising under" jurisdiction since only state law issues are presented by the claim. Second, the Universities argue that there is no "actual controversy" between the parties as to Counts II and III. MedImmune responds that Count I creates "arising under" jurisdiction because its resolution depends substantially on federal patent law and that Counts II and III present an actual "case or controversy" for judicial resolution. Finding subject matter jurisdiction over all claims, the motion will be denied.

### A) "Arising Under" Jurisdiction

"The Declaratory Judgment Act, 28 U.S.C. § 2201, is 'remedial only, and is not itself a basis for federal subject matter jurisdiction.'" *Volvo GM Heavy Truck Corp. v. United States DOL,* 118 F.3d 205, 210 (4th Cir.1997)(quoting *City Nat'l Bank v. Edmisten,* 681 F.2d 942, 945, n. 6 (4th

Cir.1982)). Therefore, in order to sustain jurisdiction over a declaratory judgment claim, the party asserting jurisdiction must come forward with an independent basis-i.e., diversity or federal question-for the Court's jurisdiction. The initial burden of establishing jurisdiction lies with the party asserting it. *Cardinal Chem. Co. v. Morton Int'l, Inc.,* 508 U.S. 83, 98, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993).

■ In a declaratory judgment action, in order to make the jurisdictional determination, the Court must analyze whether the "hypothetical" claim brought by the declaratory-defendant would raise a federal question. *See Cedars–Sinai Medical Ctr. v. Watkins,* 11 F.3d 1573 (Fed.Cir. 1993). If the Court would have jurisdiction over the hypothetical claim, then it has jurisdiction over the declaratory judgment claim. For patent cases, a court's jurisdiction extends over cases where the well-pleaded complaint establishes that either (1) federal law creates the cause of action; or (2) that the plaintiff's right to relief necessarily depends on resolution of substantial question of federal patent law. *See Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 808, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988).

■ The Court holds that a district court could assert jurisdiction over the hypothetical plaintiff's claim in this case. In Count I, MedImmune seeks a declaration that its product does not fall within the category of a "licensed product" within the meaning of the Agreement, because it would not infringe the '715 patent in the absence of the Agreement. The reverse claim would be that MedImmune's product is a "licensed product" because it *would* infringe the '715 patent absent the agreement. In the hypothetical claim, as in this claim, patent law and issues would be dispositive.

That a hypothetical reverse claim would look like anything but a claim dealing with infringement is an idea discredited by the actual claim filed in California which, by the Universities' own terminology, was the *mirror-image* claim. In paragraph 25 of the Complaint filed in California, the Universities, who presumably draft their allegations with exactitude, state: Plaintiffs hereby seek a declaratory judgment that MedImmune owes royalties under the Sublicense Agreement *because the '715 Patent is valid and enforceable and MedImmune would be liable for patent infringement but for the Sublicense Agreement.* Defendants now assert, despite the allegation being absent from the original complaint in the mirror-image action, that they would assert the theory that MedImmune is equitably estopped from claiming that its product does not infringe the '715 patent. As the Court reads it, however, that would not be a different legal theory (as the Universities term it), but a different legal claim entirely.

For however confusingly Count I may be worded, it is evident from the Count that at its heart lies the issue of patent infringement. If the Count were turned around in a hypothetical claim, then the declaratory-defendants would assert, just as they did, that the license is enforceable and that Synagis® would infringe the '715 patent in the absence of the license. The Court has jurisdiction over Count I.

B) *"Actual Controversy" Requirement*

■ The Universities do not dispute that there are federal question grounds for the assertion of jurisdiction over Counts II and III. They argue, however, that there is no actual controversy because MedImmune is not under a reasonable apprehension of suit. Essentially, they assert that while under license, MedImmune is not under a reasonable threat of an infringement suit. They argue that MedImmune must first breach the licensing agreement (e.g., stop paying royalties) before an actual controversy can arise. The Court be-

lieves that the relevant case law on the issue does not demand such a result.

In a more typical case, a patent holder approaches an alleged infringer (with whom the patent holder has no prior contractual relationship), accusing the other party of infringement and threatening suit. The Federal Circuit has made it clear, however, that even a party still subject to a licensing agreement may sue the other party for declaratory relief. *See C.R. Bard v. Schwartz*, 716 F.2d 874, 880 (Fed. Cir.1983)("We reject the blanket approach [that says] that there can never be an apprehension of a federal infringement suit and thus no controversy while a license is still in effect."). In such a situation, the district court is asked to determine whether under the totality of the circumstances, the plaintiff faces a reasonable apprehension of an infringement suit.[5]

The Court finds that under the totality of the circumstances, there is a reasonable apprehension of an infringement suit (even in the absence of a breach of the licensing agreement) sufficient to create an "actual controversy". Although the parties are under license, there is a clear and concrete dispute between them about whether Synagis® infringes on the '715 patent. It is beyond doubt that were MedImmune to breach the licensing agreement, Defendants would immediately file suit on infringement (and possibly other) grounds. The Universities contend that a licensee has no choice but to first withhold licensing royalties before a threat of an infringement suit can arise. Under the circumstances in the present case, the Court finds that such a threat can exist in the absence of any breach of the licensing agreement.[6]

The Court understands that (in more ways than one) this case is somewhat atypical. But as is evidenced by the suit filed in California, both sides have shown an eagerness to resolve the dispute between them.[7] To the extent that the Court finds

5. It is noteworthy to reference the Circuit split that the Federal Circuit was considering in *Bard*. The Third Circuit had held that when a licensing agreement is in effect, no threat of an infringement suit is possible; as such, a potential licensee-plaintiff would have to breach the licensing agreement, thereby creating the imminent threat of such a suit. *See Thiokol Chem. Corp. v. Burlington Industries, Inc.*, 448 F.2d 1328 (3rd Cir.1971), *cert. denied*, 404 U.S. 1019, 92 S.Ct. 684, 301 L.Ed.2d 668 (1972). Although the Universities do not specifically endorse this position, they seem to argue that no licensee can bring suit against the licensor until the licensee has first renounced the license agreement. The Second Circuit took a different position, finding that an actual controversy could exist even though the licensing agreement was still in effect. *See Warner–Jenkinson v. Allied Chem. Corp.*, 567 F.2d 184 (2nd Cir.1977). The Federal Circuit explicitly renounced the holding in *Thiokol*, holding that the predicate step of breaking the license agreement was not required. And the Court disagrees with the Universities' interpretation of *Bard* as signifying that a licensee must stop paying royalties as a separate predicate to suit.

6. At oral argument, the Universities repeatedly argued that the apprehension of suit is unreasonable because there are too many "future contingencies" between the current state of affairs and a potential infringement suit. The Court disagrees, finding only one: MedImmune's breach of the licensing agreement. In a sense, all declaratory judgment actions involves "future contingencies" in that they involve a party seeking relief *before* certain future legal action has occurred. The purpose of these type of actions is to remove the harmful uncertainty that arises when a party is unsure as to its legal position. In any event, the Court does not believe that current Federal Circuit law requires the withholding of royalties in order to convert a vague or generalized apprehension into a reasonable and concrete one.

7. The Universities beseech the Court to "follow" the analysis of Judge Breyer in the California action. Again, their reliance on that case is misplaced. The California court did

that a licensee (wishing to adjudicate questions of infringement and invalidity without the necessity of breaking a license agreement) may under the appropriate circumstances bring a suit for declaratory relief, other courts seem to concur. *See Technical Concepts, L.P. v. Zurn Industries,* 2002 WL 31027962, 2002 U.S. Dist. LEXIS 16925 (N.D.Ill.2002)(no need to rescind a licensing agreement prior to suit) [8]; *American Hospital Supply Corp. v. Damon Corp.,* 597 F.Supp. 445, 447 (N.D.Ill.1984)(citing *Precision Shooting Equipment Co. v. Allen,* 646 F.2d 313, 318 (7th Cir.1981))("In such a case, a licensee need not sit back and continue to wonder if it is justly paying royalties or merely paying a bribe to the patentee not to threaten him with business disruption and a possible damage suit if he terminates royalty payments.").[9] As MedImmune is faced with a reasonable apprehension of suit, it has sufficiently shown an "actual controversy".[10]

## III. *BURDEN OF PROOF*

■ The principles and findings enunciated in the Court's analysis as to subject matter jurisdiction inform the Court's determination as to who bears the burden of proof on Count I of the Amended Complaint. MedImmune's position is that since Count I deals with the question of whether Synagis® infringes the '715 patent, Defendants bear the burden of proof as to Count I. Defendants argue that Count I is essentially a contract claim-an argument somewhat supported by the Count's title-and that, as such, MedImmune bears the burden as to Count I. Reduced to its core, Defendants' argument is that Plaintiff must first breach the licensing agreement before it can bring a more typical declaratory judgment non-infringement action. The Court concludes that, as the patent holders, Defendants bears the burden of proof on infringement and thus bear the burden as to Count I.

Generally, "[t]he burden always is on the patentee to show infringement." *Under Sea Industries, Inc. v. Dacor Corp.,* 833 F.2d 1551, 1557 (Fed.Cir.1987). Thus, in a typical patent infringement declaratory judgment case where the declaratory plaintiff seeks a holding of non-infringement, the patent holder retains the burden of proof despite being the nominal defen-

---

*not* hold that there was no "actual controversy" due to the licensing agreement. Instead, the court there held that the ruling in this case would eliminate any potential infringement suit.

8. In assessing whether the declaratory-plaintiff had a reasonable apprehension of suit, even in the absence of a breach of the licensing agreement, the *Technical* court stated: "[defendant] did not explicitly rule out future litigation during that conversation, and thus [plaintiff] could reasonably fear, based on [defendant's] actions, that a lawsuit *would follow closely on the heels of the Agreement's termination." Id.* at *5, 2002 U.S. Dist. LEXIS 16925 at *17 (emphasis added).

9. The cases cited by the Universities do not aide their cause. For example, *Chattanooga Corp. v. Klingler,* 621 F.Supp. 756 (E.D.Tenn. 1985) is unpersuasive for two reasons. First,

in *Chattanooga,* the Court noted that the declaratory-defendant had never alleged infringement. Here, Centocor has alleged infringement from the very beginning of the relationship between the disputants. Second, the case relied on a proposition-a licensee still paying under a license has no apprehension of suit-that is inconsistent with *Bard.*

10. Although the two-pronged test cited by the Universities has not evidently been applied in these type of cases, even if the Court applied it here, the result would be the same. The first prong is satisfied by the Court's holding that a reasonable apprehension exists. The second prong is easily satisfied: MedImmune is, according to Defendants, currently infringing on the '715 patent. *See Intellectual Prop. Dev., Inc. v. TCI Cablevision, Inc.,* 248 F.3d 1333, 1340–41 (Fed.Cir.), *cert. denied,* 534 U.S. 895, 122 S.Ct. 216, 151 L.Ed.2d 154 (2001).

dant. *See, e.g., Glenayre Elecs., Inc. v. Jackson*, 2003 WL 366574, \*17, 2003 U.S. Dist. LEXIS 2332, \*47 (N.D.Ill.2003). This relates in some ways to the "flexible approach" to determining burden issues, which requires, as this Court has put it, that the party who "asserts the affirmative of an issue" must hold the burden of proof. *See Stash, Inc. v. Palmgard Int'l, Inc.*, 937 F.Supp. 531, 534, n. 8 (D.Md.1996).

It is evident, therefore, that the determination of who bears the burden of proof hinges on the Court's framing of the issue in Count I. The question of who is "asserting the affirmative" is tied to what issue is to be resolved in Count I. Despite its somewhat awkward phrasing, the Court concludes that the issue to be determined in Count I is infringement; i.e., the determination as to whether Synagis® is a "licensed product" will be resolved by the question of infringement. Evidence will be presented by both sides on the question of infringement. The fact-finder will then determine whether the '715 patent is infringed by Synagis®. That determination will result in the decision as to who prevails on Count I.[11]

Centocor seems to admit that if MedImmune had breached the licensing agreement, Defendants would bear the burden of proof on infringement. It argues, however, that absent a breach of the licensing agreement, it would lead to an "absurd result" to allow the burden of proof to reside with the patent holders. Notably, Centocor does not cite to any authority for the proposition that only a licensee who has breached the licensing agreement may bring a declaratory judgment act for non-infringement. In fact, the Court does not agree that there is anything "absurd" or

"unjust" about the result of its decision. The parties bargained at arms-length to formulate the terms of the Agreement. Presumably, in that both parties signed the agreement, each side believed that it was receiving adequate consideration. Centocor argues that MedImmune should not now be allowed to "have it both ways," enjoying the benefits of the Agreement while suing for declaratory relief. But the Court is compelled to repeat what it has already stated: *both* parties are mutually benefitting from the agreement being in effect. MedImmune has benefitted from immunity from suit and Centocor has equally benefitted from royalty payments.

The change in the status quo sought by MedImmune is a finding that it does not have to pay those royalty payments any more. That determination, in the Court's view, comes down to infringement. For however Count I is framed, the issue presented is whether MedImmune's product infringes the '715 patent. As such, in accordance with the general rule in infringement action, the patent holders must show that Synagis® infringes.

## IV. *FAILURE TO PLEAD WITH PARTICULARITY*

The Universities have also moved this Court to dismiss or grant judgment on the pleadings on the claims asserted in MedImmune's Amended Complaint for failure to plead these claims with sufficient particularity. Specifically, the Universities contend that: (1) MedImmune provides no factual or legal basis for its patent invalidity claim which, therefore, fails to satisfy Rule 8(a); and (2) MedImmune's allegation that the '715 patent is unenforceable due

---

**11.** This conclusion is premised on the fact that no *other* issues as per the licensing agreement will arise during the course of the litigation. If MedImmune seeks to add other arguments to the mix about whether Synagis® is a

"licensed product" (i.e., contractual intentions), the Court might be asked to determine anew at that point whether MedImmune has improperly sought to transfer the burden to the opposite side.

to inequitable conduct contains insufficient factual support to satisfy the particularity requirement of Rule 9(b). MedImmune responds that the Amended Complaint sufficiently sets forth the grounds of a claim for invalidity and the factual allegations in support of a claim for inequitable conduct. The Court makes the following conclusions. First, MedImmune's patent invalidity claim does not satisfy Rule 8(a) and, therefore, MedImmune will be granted leave to amend its Amended Complaint to include the grounds upon which its invalidity claim rests. Second, MedImmune's unenforceability due to inequitable conduct claim meets the particularity requirement of Rule 9(b) but, if during the course of preparing its Second Amended Complaint MedImmune is able to provide factual allegations adding specificity to its claims of inequitable conduct, such information should be provided.

### A) *Rule 8(a)*

 To satisfy Rule 8(a), a pleading which sets forth a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The purpose of the "short and plain statement" is to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). However, vague and conclusory allegations are insufficient to satisfy the notice pleading requirements of the Federal Rules of Civil Procedure. *Simpson v. Welch*, 900 F.2d 33, 35 (4th Cir.1990).

In Count II of the Amended Complaint, MedImmune claims that the '715 patent is invalid. In its opposition to the Universities' motion, MedImmune appears to allege prior art and the written description requirement as the grounds for this invalidity claim. However, the Amended Complaint makes no mention of these grounds. Paragraph 33 of the Amended Complaint, wherein MedImmune contends the grounds for its invalidity claim lie, alleges that the Universities misrepresented that conception of the claimed invention occurred before the publication of a critical prior art reference, misrepresented that the claimed invention would work in a wide variety of cell types, and omitted information indicating that the claimed invention would not work in a wide variety of cell types. The Court gleans that this paragraph deals with a charge of inequitable conduct. However, it appears as though MedImmune attempts to argue additional grounds for its invalidity claim in its opposition motion. Plus, at the motions hearing, MedImmune revealed that it might assert grounds for its invalidity claim that it did not even include in its opposition motion. MedImmune's failure to set forth these grounds in its Amended Complaint renders Rule 8(a) unsatisfied.

The Court will not allow MedImmune to continuously expand the basis for its invalidity claim. In arguing the merits of Count II, MedImmune will be confined to the grounds allegedly supporting invalidity that are set forth in its complaint and satisfy Rule 8(a). Thus, the Court requests that MedImmune file a Second Amended Complaint, within ten days of entry of the attached order, that clearly alleges all grounds upon which its invalidity claim rests.

### B) *Rule 9(b)*

 Rule 9(b) requires that, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall

be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). Inequitable conduct includes affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false information, coupled with an intent to deceive. *Baxter Int'l Inc. v. McGaw, Inc.,* 149 F.3d 1321, 1327 (Fed.Cir.1998). Courts generally hold that allegations of inequitable conduct are subject to the particularity requirements of Rule 9(b). *See Rhone–Poulenc Agro S.A. v. Monsanto, Co.,* 73 F.Supp.2d 537, 538 (M.D.N.C.1999); *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.,* 989 F.Supp. 1237, 1247 (N.D.Cal.1997). Accordingly, the "circumstances" required to be pled with particularity are the time, place, and contents of the inequitable conduct, as well as the identity of the parties responsible for the inequitable conduct. *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir.1999). Court's recognize that the purpose behind requiring such particularity is to provide a defendant fair notice of the substance of a plaintiff's claim so that the defendant can formulate a defense. *See Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988).

In Count III of the Amended Complaint, MedImmune alleges that the '715 patent is unenforceable due to inequitable conduct. The Court feels satisfied that the claims of inequitable conduct contained in the Amended Complaint comply with the particularity requirement of Rule 9(b). MedImmune pleads the time and place of the alleged inequitable conduct with the statement, "[D]uring prosecution before the PTO." MedImmune's specification that the "Applicants" are responsible for the inequitable conduct satisfies the identity requirement because MedImmune states the names of the patent applicants in Paragraph 12 of the Amended Complaint. The

identification of the Ochi publication as the prior art in part (a) of Paragraph 33 and statement "suggesting that the claimed invention would work in a wide variety of cell types" in part (b) of Paragraph 33 specify the content of the alleged misrepresentations. The statement in part (b) of Paragraph 33, "omitting or concealing information to the contrary," implies omission of information suggesting that the claimed invention would not work in a wide variety of cell types. As such, it specifies the content of the alleged omission. The Amended Complaint sufficiently alleges the materiality of the inequitable conduct when it states that, "[T]he '715 patent would not have issued but for these misrepresentations and/or omissions." Furthermore, Rule 9(b) allows intent to deceive to be averred generally, which MedImmune has done. The Court's conviction in making these findings is bolstered by the fact that Defendants appear to have notice of the substance of the inequitable conduct claims contained in Paragraph 33 of the Amended Complaint.

However, as indicated above, the Court is unsettled by MedImmune's seeming desire to argue that the '715 patent is invalid based on grounds that are not specified in the Amended Complaint, and thereby requests that the Amended Complaint be amended. Although MedImmune's unenforceability due to inequitable conduct claim technically satisfies Rule 9(b), if during the process of amending the Amended Complaint MedImmune is able to provide information that elaborates on the factual support for its inequitable conduct claim, the Court requests that this information be included in the Second Amended Complaint.

The Court will not look fondly upon a rehashing of the same arguments entertained herein in a second motion to dismiss or motion for judgment on the pleadings

filed by the Universities. Discovery must be allowed to proceed and, subsequent to the requests made above, the Universities should have sufficient notice for the preparation of their defense. Arguments on the merits of MedImmune's allegations should be reserved for motions for summary judgment, which will be appropriate after this litigation has moved beyond its current stall in the beginning stages of discovery.[12] In sum, the Universities' motion to dismiss and/or motion for judgment on the pleadings will be granted in that MedImmune will be required to file a Second Amended Complaint in accordance with this opinion.

## V. *PROTECTIVE ORDER*

The issue of whether counsel for MedImmune, Elliot Olstein, esq. ("Olstein"), should be allowed to view confidential and highly-confidential materials during the course of the litigation has been exhaustively argued by both parties in memoranda and in oral argument. Defendants argue that Olstein is a "competitive decision-maker" for MedImmune and that he therefore should be either denied access to the material or should refrain from prosecuting patents on the same subject matter as the litigation. Plaintiff denies that Olstein should be denied access at all but have offered to restrict some of Olstein's future patent prosecution.

Although the issue is a "close-call", the Court concludes Olstein's offer should be adopted and that Olstein should be allowed to view confidential and highly-confidential material as he is not a "competitive decision-maker". The law on counsel's access to confidential material is governed by the over-arching principles set-out in *United States Steel Corp. v. United States*, 730

F.2d 1465 (Fed.Cir.1984). As pronounced by the Federal Circuit, the policy underlying a restriction on counsel's access to confidential materials is the concern that counsel might inadvertently disclose the confidential material learned during the course of litigation. *See id.* at 1468. The competing interests to be evaluated in determining the outcome of such a dispute are one party's right to broad discovery and the other party's ability to protect its confidential materials from misuse by competitors. *See Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1469–70 (9th Cir.), *cert. denied sub nom., BB Asset Mgmt. v. Symantec Corp.*, 506 U.S. 869, 113 S.Ct. 198, 121 L.Ed.2d 141 (1992). The inquiry focuses on whether counsel can be a deemed a "competitive decision-maker", which the Federal Circuit says is shorthand for "a counsel's activities, association, and relationship with a client that is such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *U.S. Steel*, 730 F.2d at 1468, n. 3. A counsel's title as "in-house" or "retained" will not be dispositive on the issue. *See id.* In addition to determining whether a counsel is a competitive decision-maker, the Court must also analyze whether denying counsel access to confidential material would work a substantial hardship on one of the parties. *See id.*

The Court is extremely sensitive to the confidentiality concerns of a party litigating a case such as this one. Nevertheless, the Court concludes that the Universities' argument amounts to a *per se* prohibition on the use of litigation counsel who also

---

12. During the course of oral argument, the Universities made many arguments as to the *strength* of MedImmune's inequitable conduct claim. They argued that based upon discovery they had received, MedImmune could not show inequitable conduct. Those arguments are clearly premature at the motion to dismiss stage. The Universities will not be allowed to try the inequitable conduct claim on the pleadings alone.

prosecute patents. Other than Olstein's status as a patent prosecutor for MedImmune, the Court finds no other indicators that would warrant denying him access to confidential materials. MedImmune's proposed wording for the Protective Order will, therefore, be adopted.

The Universities correctly note that in-house counsel have already been denied access to confidential materials in this case. They have argued that Olstein, while not an employee of MedImmune, is effectively "in-house" counsel for MedImmune. The record does not support such a characterization nor does it support a conclusion that Olstein is a competitive decision-maker. No evidence has been proffered that Olstein participates in MedImmune's decision-making in relation to competitors in biotechnology field. He does not apparently participate in product design, pricing or marketing. His law firm and MedImmune do not share employees. The Court views Olstein's role as one of patent prosecutor in the typical sense: he takes products that MedImmune has already-developed and brings them before the Patent Office. To adopt the Universities position would inexorably lead to the conclusion that *no* attorney, whether in-house or retained, could prosecute patents for a client while still working as litigation counsel for that client. Such a result would run contrary to Federal Circuit law.

In any event, Olstein's proposal works to provide some protection to the Universities. The Universities have claimed that no information dealing with the "making" of DNA recombinant technology can be separated from information dealing with the "use" of DNA recombinant technology. They argue that it would be overly burdensome to force the Universities to exact portions of the discovery they plan to disclose. To the extent, however, that the Court's holding could allow for Olstein to have no restriction whatsoever to viewing the materials, the Court believes that his proposal sufficiently covers any potential concern that might arise.[13]

Although the Universities have attempted to discount the possibility, the Court also believes that denying Olstein access would work a hardship on MedImmune. Having worked for MedImmune for nearly twelve years, Olstein could provide a significant amount of assistance to the claims of non-infringement. That MedImmune has hired other retained lawyers to also represent it does not mean that Olstein's participation is not important to MedImmune.

The Court finds support for its conclusion in *Sibia Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*, 1997 U.S. Dist. LEXIS 24130 (S.D.Cal.1997). There, the Magistrate held that a party's patent counsel should be denied access to confidential materials because of his current and ongoing patent prosecution for the client. In overturning the Magistrate's decision, the district court made a number of pertinent observations. First, the court noted that

---

13. The Court's decision runs contrary to a holding in another district court which denied retained counsel access to confidential materials because counsel worked prosecuting patents for one of the parties. *See Interactive Coupon Marketing Corp. v. H.O.T.! Coupons LLC*, 1999 WL 618969, 1999 U.S. Dist. LEXIS 12437 (N.D.Ill.1999). The Court disagrees with the reasoning applied in *Interactive* because, in the Court's view, it amounts to a *per se* prohibition on patent counsel. If "shaping" patent applications amounts to competitive decision-making, the Court has trouble imagining a patent prosecutor who would not meet that standard. In any event, here there has been no showing that Olstein does anymore than bring the patents before the Patent Office. There has been no showing that he actively participates in MedImmune's internal decision-making process *vis a vis* its competitors.

*Motorola, Inc. v. Interdigital Tech. Corp.*, 1994 U.S. Dist. LEXIS 20714 (D.Del.1994), a case relied upon by the Universities, represented an extension of the current Federal Circuit law on the subject. *See id.* at *19. Second, the court noted that counsel in that case was not easily analogized to in-house counsel because he represented many other biotech firms, he did not serve on the client's board of directors, and his firm did not exchange any employees with the company. Third, and most importantly, the indicia of competitive decision-making were not present. Counsel was not involved in pricing or design, nor was he involved in scientific research. In short, counsel prosecuted patents for products that were already developed. *See id.* at *22–23.

Similarly here, all that has been shown is that Olstein prosecutes patents in the biotech field for MedImmune. In that regard, he is not that different from the other retained counsel in the case. He prosecutes patents for MedImmune, but he also works for many other biotech clients in their patent work. The key is "competitive decision-making": as he is not a competitive decision-maker, he does not need to be restricted in the activities he pursues for MedImmune. But his proposal offers the Universities additional protection above and beyond what is required. His proposal should be adopted.[14]

## VI. CONCLUSION

The Universities' motion to dismiss for lack of subject matter jurisdiction will be denied because the Court has found jurisdiction over all three Counts. The burden of proof in Count I will lie with the declaratory-defendant patent holders. The Universities' motion to dismiss on particularity grounds will be granted without prejudice, and MedImmune will be granted leave to file a Second Amended Complaint within ten (10) days of the entry of this Order, after which time Defendants will have ten (10) days to file a responsive pleading. Lastly, MedImmune's counsel will be allowed to view confidential materials subject to the restriction that he has proposed. The Court further notes that there are now currently pending motions to compel discovery. The Court will be referring all discovery disputes to a Magistrate in furtherance of moving the proceedings in this case forward. An Order consistent with this Opinion will follow.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion dated July 16th, 2003, IT IS this 16th day of July, 2003, by the United States District Court for the District of Maryland, hereby **ORDERED**:

1. That the Motion to Determine the Party Bearing the Burden of Proof [Paper No. 59] BE, and the same hereby IS, **GRANTED** in favor of Plaintiff;

2. That the Motion to Dismiss filed by the Universities [Paper No. 62] BE,

14. Certain cases which denied in-house counsel access to confidential materials can be distinguished on the facts. For example, in *Intel Corp. v. VIA Tech., Inc.*, 198 F.R.D. 525 (N.D.Cal.2000), the court denied Intel's in-house counsel access to confidential materials in part because of her "interactions with Plaintiff's business unit managers and with her supervisor ...." *See id.* at 532. Here, no showing has been made that Olstein has any regular interaction with any supervisors at MedImmune. *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 1998 WL 1059557, 1998 U.S. Dist. LEXIS 22251 (D.Nev.1998) is also inapposite because there the Court found that the patent counsel was currently prosecuting patents on the exact same subject matter of the litigation. No such showing has been made here.

and the same hereby IS, **GRANTED without prejudice**;

3. That the Motion to Dismiss [Paper No. 63] BE, and the same hereby IS, **DENIED-as-moot**;

4. That the Motion to Leave to File Surreply [Paper No. 114] BE, and the same hereby IS, **DENIED-as-moot**;

5. That the Cross–Motion for Dismissal for Lack of Subject Matter Jurisdiction [Paper No. 116] BE, and the same hereby IS, **DENIED**;

6. That the Motion to Seal Exhibit and to Substitute Pleading [Paper No. 83] BE, and the same hereby IS, **GRANTED**;

7. That the Motion to Seal File Exhibit [Paper No. 95] BE, and the same hereby IS, **GRANTED**;

8. That the Motion for Other Relief [Paper No. 101] BE, and the same hereby IS, **DENIED-as-moot**;

9. That within ten (10) days of the entry of this Order MedImmune file its Second Amended Complaint, after which time Defendants will have ten (10) days to file a responsive pleading;

10. That the Clerk of the Court transmit copies of this Order to all counsel of record.