Addison Whitney, LLC v. Cashion, 2020 NCBC 48.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

ADDISON WHITNEY, LLC,

        Plaintiff,

v.

BRANNON CASHION; VINCENT
BUDD; RANDALL SCOTT;
ANDREW CUYKENDALL; AMY
BAYNARD; JENNIFER RODDEN;
and LEADERBOARD BRANDING,
LLC,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 1956

**ORDER AND OPINION ON
PLAINTIFF'S MOTIONS FOR
CONTEMPT AGAINST JOHN MILLER
AND TO COMPEL DISCOVERY AND
DEFENDANTS' MOTION TO COMPEL
DISCOVERY**

1.    This lawsuit, filed in January 2017, has generated an abundance of discovery disputes, leading to lengthy extensions of the case calendar. To bring discovery to a close and move to the next phase of litigation, the Court directed the parties to confer in good faith about lingering discovery issues and, if needed, to submit any insoluble disputes for resolution. Pending are three motions, comprising twenty or more distinct discovery disputes.

> *Littler Mendelson, P.C., by Michael Scott McDonald, Stephen D.
> Dellinger, Steven A. Nigh, Allan H. Neighbors, IV, and Elise Hofer
> McKelvey, for Plaintiff Addison Whitney, LLC.*

> *Van Hoy, Reutlinger, Adams & Dunn, PLLC, by G. Bryan Adams, III,
> for Defendants Brannon Cashion, Vincent Budd, Randall Scott, Andrew
> Cuykendall, Amy Baynard, Jennifer Rodden, and Leaderboard
> Branding, LLC, and for nonparty respondent John Miller.*

Conrad, Judge.

# I.
# BACKGROUND

2. This litigation is between a branding company and six former officers and employees.[1] Addison Whitney, LLC pitches itself as a specialist in branding strategy with a focus on pharmaceutical companies. Most of its management—Brannon Cashion, Vincent Budd, Randall Scott, Andrew Cuykendall, Amy Baynard, and Jennifer Rodden—resigned on the same morning in January 2017. They then launched a competing business named Leaderboard Branding, LLC (together "Defendants").

3. Addison Whitney filed suit and sought a preliminary injunction to stop the competing venture before it started. In short, Addison Whitney's theory is that the six former employees conspired to sabotage its business from the inside and to use its trade secrets as building blocks for a commercial rival. Its claims for relief include misappropriation of trade secrets, breach of fiduciary duty, conversion, and others. Defendants insist that they did everything by the book, tending to their duties at Addison Whitney until the very end and even referring clients to Addison Whitney after their departure. On a limited record, the Court granted a narrow preliminary injunction against the use of specific trade secrets but, noting the absence of noncompete covenants, refused to bar Defendants from competing altogether. *See Addison Whitney I*, 2017 NCBC LEXIS 23, at *5–6, 13, 33, 34.

---

[1] Previous orders and opinions detail the nature of this case and its procedural history. *See Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 23 (N.C. Super. Ct. Mar. 15, 2017) ["*Addison Whitney I*"]; *Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 51 (N.C. Super. Ct. June 9, 2017); *Addison Whitney, LLC v. Cashion*, 2017 NBC LEXIS 111 (N.C. Super. Ct. Dec. 1, 2017).

4. Defendants counterclaimed. They allege that Addison Whitney owes unpaid wages, mostly from commissions, under the North Carolina Wage and Hour Act. They also allege that Addison Whitney took a series of unlawful steps to stifle competition from Leaderboard Branding. Chief among these was a press release about the preliminary-injunction order, disseminated through an online ad campaign using Google AdWords. Defendants say the press release was defamatory and harmed their reputations with prospective clients.

5. Discovery disputes have bubbled up with regularity, especially on the nettlesome subject of electronically stored information ("ESI"). The parties' protocol for ESI discovery was itself a sore spot, requiring the Court to broker an agreement. (*See* Parties' Agreed Upon ESI and Computer Forensic Search Protocol, ECF No. 101 ["ESI Protocol"].) The ESI Protocol addresses the preservation, retrieval, and production of information stored on computers, on other electronic devices, and in remote e-mail and cloud storage accounts (such as Gmail or Dropbox). It also includes privilege, confidentiality, and privacy protections. Throughout, the protocol stresses the need for coordination between the parties and their forensic experts. (*See, e.g.*, ESI Protocol 3–5, 8, 9.)

6. Other sore spots have persisted. Each side accuses the other of running up costs. Defendants believe Addison Whitney's demands for ESI are intrusive and burdensome; Addison Whitney has long complained of a data dump by Defendants. Faced with a motion to compel in early 2018, (*see* Pl.'s 1st Mot. Compel, ECF No. 121), Defendants withdrew their objections and began producing complete images of thumb

drives, laptops, and other devices. In a joint status report, Defendants said they did so to give Addison Whitney latitude "to conduct searches for documents and information on its own terms to ensure that there were no claims of inadequate or incomplete production." (Parties' Joint Status Report 2, ECF No. 127.) If those were the goals, the effort misfired. Addison Whitney complained that the production was both excessive (because Defendants did not identify specific documents) and likely incomplete (because Defendants might have withheld other computers and online accounts). (*See* Parties' Joint Status Report 2.) At that point, though, Addison Whitney had gotten what it initially sought and did not press for specific additional relief, mooting the underlying motion. (*See generally* Order on Disc. Mots., ECF No. 128.) These arguments would recur as discovery progressed, requiring several conferences with the Court.

7. Disputes often mean delay in litigation. At the parties' requests, the Court extended the discovery period six times. (*See* ECF Nos. 114, 118, 131, 136, 150, 162.) The last extension required all discovery to be completed by early March 2019. (*See* Order on Mot. Modify Case Mgmt. Order Deadlines 1, ECF No. 162.)

8. Less than a month before that deadline, the Court addressed the status of discovery at an in-person hearing. The Court directed counsel to confer and give a report itemizing the discovery that remained outstanding, any anticipated disputes, and an estimate of the time needed to complete discovery. The only point of consensus was that each side continued to be unhappy with the other's discovery responses. To move things along, the Court gave counsel one more chance to narrow their disputes

in good faith and also set a deadline to submit any and all lingering disputes. (*See* Order on Case Mgmt. Sched. 2, ECF No. 174.)

9. At issue are nearly two dozen disputes divided among three motions. Addison Whitney has filed a motion for contempt against John Miller, a nonparty. (*See* Pl.'s Mot. Contempt Against John Miller, ECF No. 166 ["Pl.'s Contempt Mot."].) In addition, Addison Whitney and Defendants have both filed motions to compel the other to produce documents and ESI. (*See* Pl.'s 2d Mot. Compel, ECF No. 196; Defs.' Mot. Compel, ECF No. 194.) The record is voluminous, and many of the 100 or so exhibits were filed provisionally under seal, often unnecessarily. All three motions are ripe for determination, having been fully briefed and argued at a hearing on July 31, 2019, at which all parties and Miller were represented by counsel.

## II.
## ANALYSIS

10. The rules governing discovery are liberal by design. In general, "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . ." N.C. R. Civ. P. 26(b)(1). "The test of relevancy under Rule 26 is not, of course, the stringent test required at trial. The rule is designed to allow discovery of any information *reasonably calculated* to lead to the discovery of admissible evidence . . . .'" *Willis v. Duke Power Co.*, 291 N.C. 19, 34, 229 S.E.2d 191, 200 (1976) (emphasis in original) (quoting N.C. R. Civ. P. 26(b)).

11. Yet even liberal discovery has its limits. Rule 26, though generous, should not be construed as an invitation for parties "to roam at will in the closets of others." *Reynolds Am., Inc. v. Third Motion Equities Master Fund, Ltd.*, 2018 NCBC LEXIS

115, at *5 (N.C. Super. Ct. Nov. 7, 2018) (alteration, citation, and quotation marks omitted). Courts can and should curb discovery when it would be "unreasonably cumulative or duplicative" or otherwise "unduly burdensome or expensive." N.C. R. Civ. P. 26(b)(1a). "One party's need for information must be balanced against the likelihood of an undue burden imposed upon the other." *Willis*, 291 N.C. at 34, 229 S.E.2d at 200.

12. Here, the parties have also asserted the attorney-client privilege and the work-product doctrine as grounds to resist discovery. "When the relationship of attorney and client exists, all confidential communications made by the client to his attorney on the faith of such relationship are privileged and may not be disclosed." *Dickson v. Rucho*, 366 N.C. 332, 340, 737 S.E.2d 362, 369 (2013) (alteration, citation, and quotation marks omitted). The party asserting the attorney-client privilege has the burden to show that

> (1) the relation of attorney and client existed at the time the communication was made, (2) the communication was made in confidence, (3) the communication relates to a matter about which the attorney is being professionally consulted, (4) the communication was made in the course of giving or seeking legal advice for a proper purpose although litigation need not be contemplated and (5) the client has not waived the privilege.

*State v. Murvin*, 304 N.C. 523, 531, 284 S.E.2d 289, 294 (1981). "If any one of these five elements is not present in any portion of an attorney-client communication, that portion of the communication is not privileged." *In re Miller*, 357 N.C. 316, 335, 548 S.E.2d 772, 786 (2003).

13. The work-product doctrine serves a more limited purpose: to "safeguard the lawyer's work in developing his client's case." *Evans v. United Servs. Auto Ass'n*, 142

N.C. App. 18, 29, 541 S.E.2d 782, 789 (2001) (citation and quotation marks omitted). The doctrine applies only to "documents and tangible things" that were "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's consultant, surety, indemnitor, insurer, or agent . . . ." N.C. R. Civ. P. 26(b)(3). "Materials prepared in the ordinary course of business are not protected by the work-product doctrine." *In re Ernst & Young, LLP*, 191 N.C. App. 668, 678, 663 S.E.2d 921, 928 (2008), *aff'd as modified in part,* 363 N.C. 612, 684 S.E.2d 151 (2009). Our courts have stressed that "[t]his immunity should be narrowly construed" and that the party asserting it bears the burden of proof. *Kelley v. Charlotte Radiology, P.A.*, 2019 NCBC LEXIS 84, at *8 (N.C. Super. Ct. May 15, 2019); *see also Berens v. Berens*, 247 N.C. App. 12, 22–23, 785 S.E.2d 733, 741–42 (2016); *Isom v. Bank of Am., N.A.*, 177 N.C. App. 406, 412–13, 628 S.E.2d 458, 462–63 (2006).

14.    All these matters lie within the trial court's sound discretion. *See, e.g.*, *Wachovia Bank, N.A. v. Clean River Corp.*, 178 N.C. App. 528, 531, 631 S.E.2d 879, 882 (2006); *Nationwide Mut. Fire Ins. Co. v. Bourlon,* 172 N.C. App. 595, 601, 617 S.E.2d 40, 45 (2005). For issues not definitively addressed by North Carolina courts, the Court looks to decisions that interpret and apply analogous federal rules. *See Bryson v. Sullivan*, 330 N.C. 644, 655, 412 S.E.2d 327, 332 (1992); *see also Crosmun v. Trs. of Fayetteville Tech. Cmty. Coll.*, 832 S.E.2d 223, 233 (N.C. Ct. App. Aug. 6, 2019) (noting that few North Carolina cases address ESI).

## A. Addison Whitney's Motion for Contempt

15.     The Court begins with Addison Whitney's motion for contempt against John Miller, an attorney who provided legal advice to Budd, Cashion, and Cuykendall before their resignations from Addison Whitney. Miller helped form Leaderboard Branding. He also advised Budd, Cashion, and Cuykendall about their plans to resign and compete against their former employer.

16.     Addison Whitney subpoenaed Miller twice, seeking a deposition and documents. (*See* Pl.'s Contempt Mot. Exs. 3, 5, ECF Nos. 166.1, 166.3.) Miller did not respond the first time, but Defendants objected on the grounds of attorney-client privilege, work-product immunity, and overbreadth. (*See* Pl.'s Contempt Mot. Ex. 4, ECF No. 166.2.) Despite Defendants' objections, the parties and Miller agreed to a date for his deposition, later canceled by Addison Whitney due to a scheduling conflict. (*See* Defs.' Resp. Opp'n Pl.'s Mot. Contempt ["Defs.' Contempt Opp'n"] Ex. 3, ECF No. 173.3.) The deposition was not rescheduled, and no documents were produced. In lieu of pressing the issue, Addison Whitney served a second, identical subpoena. (*See* Pl.'s Contempt Mot. Ex. 5.) Defendants renewed their objections, and this time, Miller served his own.[2] (*See* Pl.'s Contempt Mot. Exs. 6, 7, ECF Nos. 166.4,

---

[2] Addison Whitney contends that Miller waived his objections the first time around and that service of the second subpoena "did not give Mr. Miller another chance to object" because it was "not a new subpoena." (Pl.'s Contempt Mot. 8.) Addison Whitney cites no law to support that argument. In its discretion, the Court concludes there was no waiver, given Miller's timely response to the second subpoena and the absence of any evidence of bad faith. And in any event, the attorney-client "privilege belongs solely to the client," *In re Miller*, 357 N.C. at 339, 584 S.E.2d at 788, and is therefore "the client's alone to waive," *Crosmun*, 832 S.E.2d at 236. At least Budd, Cashion, and Cuykendall had standing to assert the privilege, and their timely responses would have preserved that objection even if Miller hadn't. *See, e.g.*, *Window*

166.5.) When Addison Whitney scheduled the deposition, Miller did not appear. (*See* Pl.'s Contempt Mot. Ex. 8, ECF No. 166.6.)

17. This motion followed. Although framed in the language of contempt, the motion does not actually seek to hold Miller in contempt of court. Rather, Addison Whitney asks the Court to compel Miller to sit for a deposition and to produce nine categories of documents, (*see* Pl.'s Contempt Mot. 1 n.1). *See also* N.C. R. Civ. P. 45(c)(4) ("If objection is made, the party serving the subpoena may, upon notice to the subpoenaed person, move at any time for an order to compel the subpoenaed person's appearance at the deposition or the production of the materials designated in the subpoena.").

18. Defendants contend that Miller should not be compelled to testify or produce documents because his communications with Budd, Cashion, and Cuykendall were privileged. (*See* Defs.' Contempt Opp'n 5, ECF No. 173.) Addison Whitney argues that the privilege was waived when Budd and Cashion testified about Miller's advice during their depositions. (*See* Pl.'s Contempt Mot. 5, 8, 12.)

19. The attorney-client privilege is a fragile thing. Litigants must take care not to disclose privileged material to their opponents because disclosure destroys confidentiality and waives the privilege that goes along with it. There are exceptions for some inadvertent disclosures. *See, e.g.*, *Morris v. Scenera Research, LLC*, 2011 NCBC LEXIS 34, at \*23–28 (N.C. Super. Ct. Aug. 26, 2011). But courts rarely show sympathy when a party intentionally discloses privileged material. *See, e.g.*, *State v.*

*World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 59, at \*6–7 (N.C. Super. Ct. June 19, 2018).

*Tate*, 294 N.C. 189, 193, 239 S.E.2d 821, 825 (1978) ("It is well settled that the privilege afforded a confidential communication between attorney and client may be waived by the client when he offers testimony concerning the substance of the communication."); *Hulse v. Arrow Trucking Co.*, 161 N.C. App. 306, 310–11, 587 S.E.2d 898, 901 (2003) (following *Tate*).

20. This is especially so when the disclosure is made to gain advantage in litigation. It is fundamental that the privilege cannot be used as both sword and shield. "In other words, when a party entitled to claim the attorney-client privilege uses confidential information against his adversary (the sword), he implicitly waives its use protectively (the shield) under that privilege." *Willy v. Admin. Review Bd.*, 423 F.3d 483, 497 (5th Cir. 2005). For that reason, "there is ample authority supporting the proposition that the act of raising an advice of counsel defense waives the attorney-client privilege with regard to certain matters in a particular dispute." *Richardson v. Frontier Spinning Mills, Inc.*, 2011 NCBC LEXIS 40, at *7 (N.C. Super. Ct. Oct. 6, 2011); *see also State v. Fair*, 354 N.C. 131, 168, 557 S.E.2d 500, 525–26 (2001) ("Moreover, even if the communication had been confidential, defendant waived the attorney-client privilege when he presented the substance of the communication as part of his defense.").

21. Here, Budd and Cashion testified voluntarily and in detail about the advice they received from Miller.[3] Without objection by his counsel, Budd explained that

---

[3] Each side submitted excerpts of the deposition transcripts as exhibits. The excerpts of Budd's deposition testimony appear at ECF Nos. 167.1 and 171.1. The excerpts of Cashion's deposition testimony appear at ECF Nos. 167.2 and 171.2.

we had at least two, if not maybe three, face-to-face meetings with a guy name[d] John Miller who is an attorney here in Charlotte that helped us also establish the LLC and some of those types of things. And he seemed to be a pretty good consult on the, you know, if you're going to leave this company, here is the best way to leave it. Don't do this, don't do that, don't take anything, don't plan anything during work hours. So all of the things in which you would continue to be living up to your obligation at Addison Whitney but since it is, you know, your right to—to do this other thing, to come up with a plan B. It was kind of a, you know, just make sure you are adhering to these—these types of items. Don't take anything, don't take anything, don't take anything is what he continued to tell us.

(Dep. V. Budd 230:6–21; *see also* Dep. V. Budd 236:2–5 ("Q. Well, I thought you were just telling me that you were advised not to, for example, take anything with you? A. That was his advice, yes."); Dep. V. Budd 240:16–20 ("Don't do any planning on the company time. If you are continuing to work for Addison Whitney, any—any time that you spend doing anything other than that should be weekends, nights, mornings, off days.").)

22. Budd also testified that Miller gave advice about client relationships. As the departure date approached, Budd and the others posed various "what-if scenario[s]" to Miller—for example, if certain clients

didn't want to work with [Addison Whitney.] So we were, you know, giving him most likely some hypotheticals. And I think that was probably in—and then maybe that happened in January. But I think that was the point in time where we started looking at going if there is any gray area, let's take the high road, let's not pursue, let's not do any of that. So I think that we were probably tracking to getting some of that information from him around that time, January.

(Dep. V. Budd 233:23–234:8.) Miller advised "that if there was a gray area, it would be in your best interest to shoot those clients back to [Addison Whitney] and let them satisfy the business." (Dep. V. Budd 237:6–9.) Along the same lines, Miller told them

"absolutely do not contact any customers prior to departure and say that you are leaving." (Dep. V. Budd 243:14–15; *see also* Dep. V. Budd 243:16–17 ("Q. And did you follow that advice? A. Absolutely.").) With Miller's guidance, Defendants also added a disclaimer to their marketing materials so that work performed during their time at Addison Whitney would not be attributed to Leaderboard Branding. (*See* Dep. V. Budd 305:24–306:9.)

23.　Cashion's testimony, though less extensive, touched on similar themes. He testified without objection by counsel that he sought advice from Miller about how "to do this the right way"—referring to resigning and founding a competitor. (Dep. B. Cashion 124:6.) Miller "asked if [Defendants] had a Non-Compete" and remarked "[t]hat's awesome" when told that they did not. (Dep. B. Cashion 124:18–20.) Cashion also testified that he "believe[d] part of the advice that we got was it would be better to resign collectively versus in pieces[,]" though he did not say definitively whether this advice came from Miller or was "advice given from a friend or from a legal perspective." (Dep. B. Cashion 150:2–6.)

24.　Budd and Cashion disclosed these communications because they—and the other Defendants—intend to rely on Miller's advice as a defense, apparently to show that they acted in good faith before and after leaving Addison Whitney. Defendants' counsel confirmed as much at the hearing. And Budd said so in his deposition: "I'm not waiving my attorney/client confidentiality totally. But *where I feel as though it will help my defense*, I will answer these questions." (Dep. V. Budd 230:2–5 (emphasis added).)

25. The Court concludes that Budd and Cashion voluntarily disclosed the substance of confidential communications with Miller to Addison Whitney. These communications are no longer confidential, and having partially disclosed them to support a defense based on advice of counsel, Defendants cannot "shield the underlying communications from scrutiny by the opposing party." *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000). The privilege has been waived.[4]

26. This waiver extends not only to what has been disclosed but also to all communications relating to the same subject matter. As this Court recently observed, the extent of any waiver is a question of fairness.

> Parties should not be able to disclose favorable material while concealing damaging material as privileged. Nor is it fair for a party to put the privileged communication into issue—such as through an advice of counsel defense—while relying on the privilege. In both cases, courts "broaden the waiver as necessary to eliminate the advantage."

*Technetics Grp. Daytona, Inc. v. N2 Biomedical, LLC*, 2018 NCBC LEXIS 116, at *17–18 (N.C. Super. Ct. Nov. 8, 2018) (quoting *Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 361 (3d Cir. 2007)).

27. A relatively broad subject matter waiver is appropriate in this case to prevent any unfair advantage. The subject matter of the communications disclosed by Budd and Cashion is, broadly defined, the method and manner of their

---

[4] Defendants argue that no waiver occurred because Budd and Cashion prefaced their answers by stating that they did not intend to waive the privilege. (*See* Defs.' Contempt Opp'n 2, 3, 5, 6.) That is not correct. "A privileged person would seldom be found to waive if his intention not to abandon could alone control the situation." *Hayes v. Ricard*, 244 N.C. 313, 323, 93 S.E.2d 540, 548 (1956) (citation and quotation marks omitted). Budd and Cashion could have asserted privilege and kept the communications with Miller secret. Instead, they chose to disclose Miller's advice to bolster their defense. Having done so, they cannot now maintain the privilege.

resignations from Addison Whitney. Thus, drawing from Defendants' own description of Miller's advice, the Court concludes that the subject matter waiver includes at least communications about the

> implications of not having covenants not to compete with the Plaintiff; their 2007 confidentiality agreements; formation of BVA, LLC; how to depart in the best way possible and to "take the high road" with regard to projects and customers; not to take any property belonging to Plaintiff, refer business back to Plaintiff; don't do any planning during working hours, continue to perform your normal job duties, and inserting a disclaimer into Leaderboard Branding powerpoints identifying examples of their prior work experience.

(Defs.' Contempt Opp'n 3.)

28. The upshot is that Miller must appear for a deposition. Addison Whitney may question him about communications within the scope of the subject matter waiver. Defendants remain free to object to questions that stray into privileged communications about other topics.

29. That leaves the nine requests for production attached to Addison Whitney's subpoena. Apart from the privilege objection, Miller asserts overbreadth and work-product immunity. No documents were submitted *in camera* and no privilege log was produced, making it impossible to tell whether any given document is immune or privileged (for example, privileged communications about something other than Defendants' departure from Addison Whitney). The Court therefore decides the objections on the record as it stands.

30. Request number 1 is overbroad because it seeks *all* communications with Defendants regardless of the subject. (*See* Pl.'s Contempt Mot. Ex. 7 at 3.) Rather than strike the request, the Court modifies it to cover only those communications

disclosed by Budd and Cashion and other communications within the subject matter waiver discussed above—that is, the method and manner of their resignations from Addison Whitney. Miller shall produce documents responsive to this request, as modified.

31. Request numbers 2 and 3 ask for documents and communications about Leaderboard Branding's formation and ownership. (*See* Pl.'s Contempt Mot. Ex. 7 at 3, 4.) The objection to these requests appears to be that they are cumulative of other discovery. (*See* Defs.' Contempt Opp'n 10.) The Court overrules that objection. Defendants do not point to any specific documents they produced on these topics, and the requests do not appear to be unreasonably cumulative.

32. Request numbers 4 through 6 relate to Miller's pursuit of trademarks, copyrights, and patents on Defendants' behalf. (*See* Pl.'s Contempt Mot. Ex. 7 at 4– 6.) Request number 7 relates to Miller's pursuit of financing on their behalf. (*See* Pl.'s Contempt Mot. Ex. 7 at 6.) The requests are not overly broad or unduly burdensome as Defendants contend—indeed, it seems that Miller may not have any responsive documents, and the burden to say so would be minimal. (*See* Defs.' Contempt Opp'n 10.) That said, if Miller has responsive documents, Defendants may have legitimate privilege objections. Neither Budd nor Cashion testified about communications with Miller on these subjects, and they do not appear to be related to the advice-of-counsel defense. Miller should produce any nonprivileged, responsive documents and identify any documents under a claim of privilege in an appropriate privilege log.

33. The Court sustains the objection to request number 8. That request, which asks for "[a]ll work product" prepared by Miller, (Pl.'s Contempt Mot. Ex. 7 at 7), is overbroad and nonspecific, even if the attorney-client privilege and work-product immunity do not apply or were waived as Addison Whitney contends. *See Alexander Interactive, Inc. v. Adorama, Inc.*, 2014 U.S. Dist. LEXIS 84604, at *41–42 (S.D.N.Y. June 17, 2014) (denying request for "all work product" that did not specify factual material being sought). Miller need not produce documents responsive to request number 8.

34. The ninth and final request covers invoices and billing statements for work Miller performed for Defendants. (*See* Pl.'s Contempt Mot. Ex. 7 at 7.) Miller objects to the relevance. (*See* Defs.' Contempt Opp'n 10.) The Court is not convinced that the request is irrelevant, but it does appear to be encompassed by the first request for communications with Defendants. The Court therefore modifies this request in similar fashion. Miller shall produce all invoices and billing statements for work performed within the subject matter waiver discussed above. If the documents include entries for other matters that remain privileged, those entries may be redacted and recorded in an appropriate privilege log. No further response is required.

35. All other objections to the document requests are overruled, including any work-product objections. Miller has not identified specific documents that supposedly contain protected work product and therefore has not carried his burden. *See, e.g.*, *United States v. Hatfield*, 2010 U.S. Dist. LEXIS 4026, at *27 (E.D.N.Y. Jan. 8, 2010)

(holding that party did not carry her burden when she "failed to identify any specific documents as privileged or protected by the work product doctrine, and certainly never presented such documents to the Court"); *see also Subramanian v. Lupin Inc.*, 2019 U.S. Dist. LEXIS 68776, at *16 (S.D.N.Y. Apr. 23, 2019) (similar); *Sonnino v. Univ. of Kan. Hosp. Auth.*, 221 F.R.D. 661, 669 (D. Kan. 2004) (similar).

36.    Accordingly, the Court grants Addison Whitney's motion in part. On or before July 15, 2020, Miller shall appear for a deposition. By the same date, he shall also produce documents responsive to request numbers 1 through 7 and 9, as modified. Counsel shall confer and agree to a reasonable time and place for the deposition, bearing in mind official guidance about COVID-19 precautions and the need to preserve the health and safety of all.

### B. Addison Whitney's Motion to Compel

37.    Addison Whitney's motion to compel covers a range of matters, mostly concerning the adequacy of Defendants' production of ESI and other information. (*See generally* Pl.'s 2d Mot. Compel, ECF No. 196.) There are also disputes about Defendants' privilege logs and whether to modify the parties' stipulated protective order.

### a. Text Messages

38.    The first dispute relates to Defendants' production of text messages. Addison Whitney argues, and Defendants deny, that the production is incomplete.

39.    There are two related reasons for Addison Whitney's suspicion. One is that some Defendants did not produce any text messages from software platforms they

admit having used. Budd and Scott, for example, used the WhatsApp platform yet did not produce any WhatsApp messages. (*See* Aff. J. Shapiro ¶¶ 22–25, 31–33, ECF No. 200.) Likewise, Cuykendall produced no text messages that he sent or received through Apple's iMessage service. (*See* Aff. J. Shapiro ¶¶ 26–30.)

40.    The second reason is that some Defendants did not produce messages known to exist from other sources. These include a text string that Rodden exchanged with Lizzy Guterma, an Addison Whitney employee, about plans to leave the company in January 2017. Addison Whitney obtained the texts from Guterma, but Rodden did not produce them. (*See* Compl. Ex. A, ECF No. 1; Aff. J. Shapiro ¶¶ 34–44.) The missing messages also include WhatsApp conversations produced by Baynard and Rodden but absent from the productions for Budd, Cashion, and Scott, even though one or more of them were part of the conversations. (*See* Aff. J. Shapiro ¶¶ 19–25, 31–33.)

41.    Defendants do not deny these discrepancies. Neither do they explain them. A review by Defendants' forensic expert turned up some of Cuykendall's iMessages, which had been inadvertently withheld and have now been produced. (*See* Aff. C. Walton ¶¶ 19, 20, 22, ECF No. 205.2.) Otherwise, Defendants insist that they have "imaged all of their cell phones, and have provided [Addison Whitney] with text messages, MMS messages, What's App [sic] messages and any other communications on those devices, except those which are privileged or private personal communications." (Defs.' Resp. Opp'n Pl.'s 2d Mot. Compel 7, ECF No. 205 ["Defs.' Opp'n"]; *see also* Aff. C. Walton ¶¶ 9, 10, 17–20, 23.)

42.     Some measure of relief is in order, given the compelling evidence of missing data and Defendants' unsatisfying explanation for it.  The productions from Baynard and Rodden show clearly that Budd, Cashion, and Scott did not produce responsive messages that they either sent or received, but Defendants' expert could not speak to "the individual custodians' circumstances and whether such messages ever existed." (Aff. C. Walton ¶ 25.)  Perhaps there is an innocent explanation.  The messages may have been overlooked in the same way that Cuykendall's iMessages were.  Other possible explanations—such as deletion of evidence—are less likely to be innocent.  Either way, when some messages are known to be missing, it is reasonable to wonder whether others are too.  *See, e.g., Nursing Home Pension Fund v. Oracle Corp.*, 254 F.R.D. 559, 565 (N.D. Cal. 2008) ("[H]aving established with certainty that numerous emails were not produced from Ellison's email files—because the emails *were* produced from other files or accounts—it is impossible to know whether additional unproduced emails were also deleted or not turned over.").

43.     Addison Whitney requests either an explanation from Defendants (and a complete production if more messages are found) or access to the images of Defendants' devices so that it can perform its own forensic review.  The Court opts for the less intrusive measure.  Defendants must investigate the discrepancies.  If Defendants find messages that were inadvertently withheld, the messages should be produced along with an explanation of how they were recovered.  On the other hand, if Defendants find nothing more, they must explain whether and under what circumstances the messages were deleted.  *See Robinson v. City of Ark. City*, 2012

U.S. Dist. LEXIS 103807, at *12–13 (D. Kan. July 26, 2012) (compelling party to "investigate the circumstances surrounding the deletion of" an e-mail and to produce results of investigation).

b. Third-Party Cloud Accounts

44. A second ESI dispute concerns the method that Defendants used to produce data from their third-party cloud accounts, such as Gmail or Dropbox. Defendants produced synced copies of these accounts: roughly speaking, a synced copy is an electronic folder used to save and store information in a cloud account on a user's local computer. (*See* Aff. C. Walton ¶¶ 11–16.) Addison Whitney argues that this method of recovery and production violates the parties' ESI Protocol and asks the Court to compel Defendants "to immediately arrange for the total capture of [third-party] cloud accounts . . . ." (Pl.'s 2d Mot. Compel 7.)

45. No violation occurred. The ESI Protocol doesn't require any particular method for recovering data from third-party accounts. Twice, it states that the parties and their experts must confer and agree on a method of capture. (*See* ESI Protocol 3 ("[T]he substance of any files or data recovered and produced from a [third-party account] will be recovered and produced using a method mutually agreed upon by the Parties [sic] forensic experts . . . ."); ESI Protocol 5 ("[T]he Parties and their forensic experts will confer and agree upon the best method of capture of the information in the [third-party accounts].").) Through mutual neglect, that conference never happened. Defendants could not have breached an agreement that was never made.

46.     Addison Whitney nevertheless argues that Defendants' production of synced "images" was inconsistent with earlier representations that they would perform complete "downloads" of the accounts. (*See* Pl.'s 2d Mot. Compel 5–6 & n.3.) The e-mail traffic in the record does not support that assertion. Defendants' counsel never promised a "forensic download" or "forensic capture." (*See* Pl.'s 2d Mot. Compel Exs. 17, 18, ECF Nos. 196.16, 196.17.) Indeed, both sides appear to have used the words "images" and "downloads" interchangeably. (*See* Pl.'s 2d Mot. Compel Ex. 18 at 4 (e-mails from counsel for Addison Whitney referring to "TPA account images").)

47.     Addison Whitney also argues that the sync process is inadequate because it can be applied selectively so that some data stored in the cloud would not appear on the local computer hard drive. (*See* Aff. J. Shapiro ¶¶ 8–10, 14.) That may be true, and there are likely more thorough methods of recovery and production. But the evidence does not show that Defendants used the sync process in bad-faith to hide data. And if Addison Whitney wanted Defendants to use a more thorough method, it should have said so in a timely way through the process that it agreed to in the ESI Protocol. There is no reason to rewrite the ESI Protocol after the fact to prohibit the production of synced copies or to require a different, more expensive method of recovery.

48.     On this issue, Addison Whitney's discontent is a product of its own making. At no point did Addison Whitney request a conference, propose a method of recovery, or object to Defendants' efforts to produce data without first reaching an agreement

about the method for doing so. The request to compel a complete download of third-party cloud accounts is denied.

c. Leaderboard Branding's Financial Information

49. The next dispute relates to Leaderboard Branding's financial information. The issue is one of breadth. Addison Whitney asserts that it has received only incomplete and outdated financial summaries; it seeks a swath of additional data. (*See* Pl.'s 2d Mot. Compel 8, 10; Pl.'s 2d Mot. Compel Ex. 21 at 8–11, ECF No. 196.20.) Defendants say they might be willing to produce discrete items but object to anything more as overly burdensome. (*See* Defs.' Opp'n 9–11.)

50. As the hearing made clear, most of the data that Addison Whitney seeks is contained in a QuickBooks software file, which Leaderboard Branding uses to keep its financial and accounting information. Equally clear is that there is no real dispute about the relevance of that file, just a misunderstanding. Defendants' counsel thought the file had been produced. It hadn't: Addison Whitney searched Defendants' computer images in vain. (*See* Aff. D. Hoffman ¶ 6, ECF No. 199.) As best the Court can tell, Defendants have no reasoned objection to producing the QuickBooks file now, given that they intended to do so long ago. Defendants also agreed at the hearing to produce an updated profits and loss statement. Together, these two documents would largely satisfy Addison Whitney's needs, and in its discretion, the Court declines to require any more burdensome and likely cumulative production of other financial documents.

51.     Accordingly, Leaderboard Branding shall produce the QuickBooks file and an updated profits and loss statement. In all other respects, Addison Whitney's request for financial information is denied.

d. Leaderboard Branding's Confidential Information

52.     Addison Whitney requested that Leaderboard Branding "[i]dentify each and every type of information, whether individually or in compilation, that Defendant Leaderboard [Branding] considers and treats as confidential, proprietary, or trade secret to its business." (Pl.'s 2d Mot. Compel Ex. 21 at 3.) Defendants object to the request as irrelevant and overly broad. (*See* Defs.' Opp'n 11–13; Pl.'s 2d Mot. Compel Ex. 21 at 3.)

53.     This request is facially overbroad. It may be true, as Addison Whitney contends, that a plaintiff in a trade-secret misappropriation case needs discovery of information that a defendant considers confidential. But the discovery must be based on the asserted trade secrets. This request has no limit, calling for every bit of confidential information from a direct competitor. It is hard to imagine a more intrusive request.

54.     Addison Whitney asserts that it has specified its own trade secrets in keeping with the requirement that "a plaintiff alleging a trade secret misappropriation claim must identify its trade secrets with reasonable particularity before it is allowed to obtain discovery of a defendant's confidential information and trade secrets." *DSM Dyneema, LLC v. Thagard*, 2014 NCBC LEXIS 51, at *11 (N.C. Super. Ct. Oct. 17, 2014). Perhaps it has. Even so, the prediscovery disclosure

requirement exists so that courts can discern the relevance of the plaintiff's discovery requests and prevent needless disclosure of the defendant's confidential information. *See id.* at *11–12. It is not a box-checking exercise that leads to unlimited discovery of a competitor's confidential information, whether related to the disclosed trade secrets or not.

55. Addison Whitney also argues that it needs this information "to test Defendants' defense that little to nothing in the industry is confidential or trade secret . . . ." (Pl.'s Reply Br. 6, ECF No. 218.) If the point is that Defendants keep some things secret, that isn't in dispute, and Addison Whitney doesn't need an exhaustive list of Defendants' secrets to prove it. If instead the issue is whether Addison Whitney's own alleged trade secrets are public knowledge, then it is simply looking in the wrong place.

56. The Court denies the request.

e. Privilege Logs

57. Next, Addison Whitney contends that Defendants' privilege logs are deficient. (*See* Pl.'s 2d Mot. Compel 12–13.) A party withholding otherwise discoverable materials as privileged must serve privilege logs that describe the information in a way that enables the other parties to assess the privilege claim without revealing the protected information. *See* N.C. R. Civ. P. 26(b)(5); Business Court Rule ("BCR") 10.5. The case management order requires the parties to provide the date of the protected communication, the author and recipient, a description of

the subject matter, and the privilege asserted, among other things. (*See* Third Am. Case Mgmt. Order 5–6, ECF No. 131.)

58. In support, Addison Whitney attaches four pages from Defendants' privilege logs in which the entries do not identify the author or recipient of the communications. (*See* Pl.'s 2d Mot. Compel Ex. 24, ECF No. 196.21.) Defendants should revise these pages to correct that deficiency and to comply with the case management order in all other respects.

59. It is not clear if Addison Whitney also seeks to compel Defendants to revise other privilege logs that are not in the record. If it does, that request is denied. Addison Whitney has not offered evidence of other deficiencies. There is no basis to require comprehensive revisions.

60. Defendants shall revise the entries shown in exhibit 24 to Addison Whitney's second motion to compel. In all other respects, Addison Whitney's motion to compel as to Defendants' privilege logs is denied.

f. Bridget Budd's E-mail Accounts and Laptop Computer

61. For the second time, Addison Whitney seeks to compel discovery responses from Budd's wife, Bridget. In early 2018, Addison Whitney learned that Budd had sent a copy of its training manual to Bridget's business e-mail address. (*See* Parties' Joint Status Report 3.) Based on that single e-mail, Addison Whitney sought a forensic image of her e-mail account. The Court concluded "that Addison Whitney's request to image the entire e-mail account of a non-party [was] facially overbroad." (Order on Disc. Mots. 4.)

62.    Now, Addison Whitney argues that circumstances have changed.  During her deposition, Bridget denied having extensive involvement in the planning that led to Leaderboard Branding's creation.  (*See* Dep. B. Budd 22:16–23:7, 23:8–18, ECF No. 197.1.)  Addison Whitney believes this was false.  It argues that Defendants used her business office for meetings and that she received confidential information by e-mail. (*See* Pl.'s 2d Mot. Compel 15; Pl.'s 2d Mot. Compel Exs. 27, 28, ECF Nos. 197.5, 197.6.) Addison Whitney served Bridget with a subpoena and now asks the Court to compel her to provide forensic images of one business e-mail account, two personal e-mail accounts, and her laptop.  (*See* Pl.'s 2d Mot. Compel 14–15, 15 n.4; Pl.'s 2d Mot. Compel Ex. 21 at 31–32.)

63.    It's not clear that Bridget was served with a copy of the motion; as a nonparty, she does not receive electronic notice of case filings.  The notice issue can be shelved, though, because the Court again concludes that Addison Whitney's request is overbroad.  Assuming Defendants used Bridget's office for a few meetings, there is still no persuasive evidence that she participated in the meetings, much less that she was a key player in the creation of Leaderboard Branding.  In addition, Addison Whitney has not shown that the few documents Bridget received by e-mail are sensitive or important to the issues in the case.  This is not enough to justify the burden, expense, and intrusiveness of imaging a nonparty's e-mail accounts and laptop computer.  *See Crosmun*, 832 S.E.2d at 233 ("[A] Court must be mindful of the potential intrusiveness of ordering forensic imaging." (alteration, citation, and quotation marks omitted)); *Arris Grp., Inc. v. Cyberpower Sys. (USA)*, 2017 NCBC

LEXIS 58, at *7, 8 (N.C. Super. Ct. July 11, 2017) (observing that courts must "protect nonparties from burden and expense imposed without sufficient justification" (citation and quotation marks omitted)).

g. Addison Whitney's Fourth Requests for Production

64.     Defendants objected to all thirteen requests in Addison Whitney's fourth requests for production and did not produce any documents. (*See* Pl.'s 2d Mot. Compel Ex. 21 at 19–21, 23–29.) The requests break down into two groups. The first group asks for copies of Defendants' drug name database, master case studies list, and client tracking database. (*See* Pl.'s 2d Mot. Compel Ex. 21 at 20.) The second group relates to intellectual property protections, development records, and communications with third parties (including pitch materials) about certain software tools and business methods used by Defendants, called SCORE, POCA, and INN. (*See* Pl.'s 2d Mot. Compel Ex. 21 at 19–21.)

65.     Addison Whitney seeks complete responses. (*See* Pl.'s 2d Mot. Compel 15–16.) Defendants contend that the requests are based on claims that have been dismissed and, thus, are no longer relevant. *See Addison Whitney, LLC v. Cashion*, 2019 NCBC LEXIS 17, at *7, 8 (N.C. Super. Ct. Mar. 6, 2019) (granting motion to dismiss claims related to contracts governing the ownership of employee work product).

66.     The Court concludes that the requests are relevant to claims that have not been dismissed. Addison Whitney has alleged that its trade secrets include, among other things, a proprietary drug name database, confidential case studies for past

projects, and a SalesForce database with sensitive client leads and other information. (*See* Third Am. Compl. ¶¶ 20(a), (g), (i), ECF No. 151.)  Addison Whitney claims that Defendants misappropriated each.  Defendants' own drug name database, case studies, and client database are surely relevant to that claim.  Likewise, Addison Whitney alleges that Budd developed the SCORE process and that Cuykendall developed the POCA and INN tools while still employed with the company and using its resources.  (*See* Third Am. Compl. ¶¶ 60, 115, 116, 176, 177.)  If these Defendants used Addison Whitney's resources to develop work product that they intended to use to compete against it, that could support the claim for breach of fiduciary duty.  Thus, the requests about SCORE, POCA, and, INN are reasonably calculated to lead to the discovery of admissible evidence.

67.    Defendants make no objection other than relevance.  That objection is overruled, and they shall produce documents responsive to Addison Whitney's fourth requests for production.

h. Modification of Protective Order

68.    As an addendum to its motion to compel, Addison Whitney seeks to amend the parties' consent protective order so that it may share material designated as attorney eyes' only ("AEO") with two unnamed employees.  (*See* Joint Stipulation for Entry of Agreed Protective Order, ECF No. 109 ["Protective Order"].)  The basis for the request is that "counsel requires assistance from [Addison Whitney] personnel in preparing its case," ostensibly because there aren't any independent expert witnesses

in the branding industry. (Pl.'s 2d Mot. Compel 17–18.) Defendants oppose allowing their competitor's employees to review AEO materials. (*See* Defs.' Opp'n 19–20.)

69. The protective order is a blanket protective order of the type "routinely entered into by parties in commercial litigation, especially in cases between competitors." *SmartSignal Corp. v. Expert Microsystems, Inc.*, 2006 U.S. Dist. LEXIS 32305, at *6 (N.D. Ill. May 12, 2006). By agreement, the parties may protect documents that they believe in good faith to contain trade secrets or other confidential information, and especially sensitive material may be further "limited to 'attorney eyes only.'" (Protective Order 2.) "The disclosure of confidential information on an attorneys' eyes only basis is a routine feature of civil litigation involving trade secrets." *Paycom Payroll, LLC v. Richison*, 758 F.3d 1198, 1202 (10th Cir. 2014) (citation and quotation marks omitted).

70. As the moving party, Addison Whitney must show good cause. *See, e.g.*, *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 881 F.3d 550, 566 (7th Cir. 2018). Relevant considerations include the nature of the protective order, the foreseeability of the requested modification, the parties' reliance on the order, and the potential harm from granting or denying the modification. *See, e.g.*, *Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 531–32 (N.D. Cal. 2000); *Bayer AG v. Barr Labs., Inc.*, 162 F.R.D. 456, 462–63 (S.D.N.Y. 1995). The Court concludes that Addison Whitney has not met its burden.

71. First, the nature of the protective order weighs against modification. Addison Whitney agreed to the protective order; it was not imposed by the Court. "A

party's prior consent to the protective order will weigh against its motion for modification." *Bayer AG*, 162 F.R.D. at 466; *accord Royal v. Boykin*, 2018 U.S. Dist. LEXIS 211089, at *6 (N.D. Miss. Dec. 14, 2018); *United States ex rel. Fisher v. Ocwen Loan Servicing, LLC*, 2016 U.S. Dist. LEXIS 7475, at *9 (E.D. Tex. Jan. 22, 2016); *SmartSignal*, 2006 U.S. Dist. LEXIS 32305, at *5.

72. Second, the requested modification was foreseeable. The protective order was entered in December 2017, not long before expert disclosures were due (though that date was later extended). Addison Whitney should have known whether it would be difficult to find an independent expert when it agreed to the AEO restrictions in the protective order.

73. Third, the request comes late in discovery, long after the parties produced volumes of material in reliance on the protective order. When producing documents, each side could mark materials as "Confidential" (allowing the other side to share them with employees "to provide assistance to counsel") or as AEO (keeping them out of the hands of the other side's employees). (Protective Order 4.) Addison Whitney's request would eviscerate that distinction and defeat the very purpose of the AEO protection that the parties agreed to in the first place. *See Ocwen Loan Servicing*, 2016 U.S. Dist. LEXIS 7475, at *12 ("The Court finds that the end of the discovery period, after the parties have relied upon the Protective Order to produce documents in the case, is not the appropriate time to dispute the Protective Order, into which the parties jointly entered.").

74. Fourth, Addison Whitney has not shown that its need for modification outweighs Defendants' need for protection. In fact, Addison Whitney has not even identified the two employees. "[T]his information is essential to the Court's ability to weigh the relative harms." *Compass Minerals Am., Inc. v. Gaia Enters., Inc.*, 2017 U.S. Dist. LEXIS 130421, at *10 (D. Kan. Aug. 16, 2017). It also bears noting that Addison Whitney's in-house counsel is authorized to access AEO materials, mitigating the need for disclosure to other employees. (*See* Protective Order 4.) The Court therefore concludes that Defendants' need to protect their confidential information from a direct competitor outweighs Addison Whitney's need to disclose that information to its nonlawyer employees.

75. Accordingly, the Court denies Addison Whitney's request to modify the protective order. *See, e.g.*, *ViaSat, Inc. v. Acacia Commc'ns, Inc.*, 2017 U.S. Dist. LEXIS 30596, at *8–10 (S.D. Cal. Mar. 2, 2017) (denying request to modify protective order to allow disclosure to in-house engineers in trade-secret litigation).

i. Defendants' Contracts with Leaderboard Branding and Rodden's Calendars

76. Finally, Addison Whitney requested Leaderboard Branding's employment agreements and Rodden's calendars. (*See* Pl.'s 2d Mot. Compel 16–17.) Defendants agreed to produce both. (*See* Defs.' Opp'n 19.) The Court therefore denies the requests as moot.

C. Defendants' Motion to Compel

77. The last motion at issue is Defendants' motion to compel. They press a half dozen or so document disputes. (*See* Defs.' Mem. Supp. Mot. Compel 14–22, ECF No.

195 ["Defs.' Mem. Supp."].)[5]  They also ask the Court to compel Addison Whitney to designate witnesses for a deposition under Rule 30(b)(6).  (*See* Defs.' Mem. Supp. 5–14.)

a. Communications Referring to Defendants

78.    In a series of requests, Defendants sought all communications that concern or refer to them.  These include requests for communications "between customers or prospective customers and Addison Whitney regarding the Defendants' departure from Addison Whitney"; communications "by any Addison Whitney employee concerning or referencing any of the Defendants or Leaderboard Branding from December 1, 2016 to the present"; and documents sent after January 21, 2017 to "current, former or prospective customers which refer to any of the individual Defendants or Leaderboard Branding, LLC." (Defs.' Mot. Compel Ex. 5 at 7, 8, ECF No. 194.5; Defs.' Mot. Compel Ex. 7 at 2, ECF No. 194.6.)  There are two disputes, both about ESI.

79.    One is whether Addison Whitney adequately searched for responsive e-mails.  Defendants argue that Addison Whitney arbitrarily limited its search to seven employees over a two-month period and should be compelled to search the e-mails of seventeen others for a longer period.  (*See* Defs.' Mem. Supp. 14–15.)

80.    In fact, Addison Whitney's search was much broader.  The evidence shows that Addison Whitney searched the e-mails of more than twenty individuals, yielding thousands of e-mails that were produced to Defendants.  (*See* Pl.'s Opp'n Defs.' Mot.

---

[5] This brief inadvertently marks the first page as page "2" so that all page numbers are off by one.  The Court uses the brief's pagination when citing it.

Compel 2, ECF No. 208 ["Pl.'s Opp'n"]; Aff. S. Nigh ¶¶ 7–9, ECF No. 206.1.) Among other things, Addison Whitney produced e-mails sent to customers regarding Defendants' departure, along with the script that its employees were directed to use when doing so. (*See* Pl.'s Opp'n 3; Aff. S. Nigh Ex. 5, ECF No. 206.2.) In addition, Addison Whitney produced other e-mails that referred to Defendants in the weeks before and after their resignations. (*See* Aff. S. Nigh Ex. 5.)

81. Defendants have not shown what the value of additional searching would be. They have not identified key individuals, time periods, or subject matters that were omitted from Addison Whitney's production. It is doubtful whether more thorough searches would turn up anything of relevance beyond what has already been produced. *See, e.g.*, *Todero v. Blackwell*, 2018 U.S. Dist. LEXIS 235872, at *3 (S.D. Ind. Apr. 5, 2018) (denying motion to compel additional e-mail searches). On the other hand, a general search for all e-mails that merely refer to Defendants, whatever the context, would turn up a great deal of irrelevant information, necessitating a lengthy and expensive review for relevance and privilege. *See Cotton v. Costco Wholesale Corp.*, 2013 U.S. Dist. LEXIS 103369, at *8 (D. Kan. July 24, 2013) (denying motion to compel production of all documents referring to party because "the requests also likely encompass a significant amount of information pertaining to unrelated issues").

82. In its discretion, the Court concludes that the burden to Addison Whitney would far outweigh the uncertain benefit of additional searches. Accordingly, the Court denies this request.

83.    A second dispute relates to text messages.  In contrast to its substantial e-mail production, Addison Whitney did not produce any responsive text messages. Defendants ask the Court to compel Addison Whitney to produce text messages sent or received on its employees' personal cell phones or to produce images of those devices.  (*See* Defs.' Mem. Supp. 15–16, 17.)  Addison Whitney objects that it has no control over its employees' personal devices and therefore cannot be compelled to produce them.  (*See* Pl.'s Opp'n 5–8.)

84.    The question is whether Addison Whitney has "possession, custody or control" over its employees' personal devices.  N.C. R. Civ. P. 34(a)(i).  This standard is met "if the party has actual possession, custody or control of the materials or has the legal right to obtain the documents on demand."  *SciGrip, Inc. v. Osae*, 2015 NCBC LEXIS 89, at *9 (N.C. Super. Ct. Sept. 28, 2015) (citation and quotation marks omitted).  In this context, relevant considerations include whether the employer issued the devices to its employees, whether the devices were used for work-related purposes, and whether the employer had any legal right to obtain data from the devices. *See, e.g.*, *Goolsby v. Cty. of San Diego*, 2019 U.S. Dist. LEXIS 140326, at *11–13 (S.D. Cal. Aug. 19, 2019); *Cotton*, 2013 U.S. Dist. LEXIS 103369, at *17–18.

85.    These considerations decidedly favor Addison Whitney.  The company does not issue mobile devices to its employees.  (*See* Aff. R. McPhail ¶¶ 3, 4, ECF No. 208.11.)  Defendants have not argued or shown that employees use their devices for business purposes, much less to what extent.  At most, there is evidence that some employees voluntarily gave text messages to Addison Whitney to support its

investigation and that Addison Whitney has a policy allowing it to "monitor . . . non-Company provided equipment that is connected to the Company network[.]" (Defs.' Mot. Compel Ex. 20 at 2, ECF No. 194.11.) But cooperation by employees does not signify control over them. And even assuming Addison Whitney's technology policy gives it a legal right to obtain text messages exchanged over its network, there is no evidence that any text messages went through that network as opposed to another, such as a cellular network.

86. The Court concludes that Addison Whitney has neither the authority nor the legal right to obtain the text messages requested by Defendants and therefore cannot be compelled to produce them. For the same reason, the Court denies the even more intrusive request to compel production of the employees' personal devices for forensic imaging. *See Goolsby*, 2019 U.S. Dist. LEXIS 140326, at *11–13 (denying motion to compel); *Cotton*, 2013 U.S. Dist. LEXIS 103369, at *17–18 (same).

b. Defendants' E-mails and Calendar Entries While Employed at Addison Whitney

87. Next up is another ESI dispute, this time about work-related e-mails and calendar entries from the computers issued to each individual Defendant during employment with Addison Whitney. (*See* Defs.' Mem. Supp. 16–17.) Relevance is not at issue. Rather, the parties dispute how far back the search must go. Addison Whitney proposes "a one-year period prior to Defendants' resignation" subject to agreement on reasonable search terms. (Pl.'s Opp'n 15.) At the hearing, counsel for Defendants argued that the search should go back several years. It was apparent

that counsel had not meaningfully discussed a compromise and that, if they had, this could have been resolved without the Court's involvement.

88. In any event, the Court concludes that it would be reasonable to search e-mails and calendar entries from May 1, 2015 through the date of Defendants' resignations. This period appears to be consistent with timeframes adopted in the ESI Protocol for other purposes. It is also tied to Addison Whitney's allegations. It was in May 2015 that Cashion allegedly sabotaged Addison Whitney's effort to secure noncompetition agreements with Budd, Scott, and Cuykendall. (*See* Third Am. Compl. ¶¶ 52–56.) Not long after, Cashion allegedly began meeting with potential investors for a new competing business. (*See* Third Am. Compl. ¶ 57.) Defendants should be able to test these allegations in discovery. But requiring Addison Whitney to go back any further would be unduly burdensome, given that the likelihood of finding relevant information diminishes rapidly before May 2015.

89. Accordingly, Addison Whitney shall produce responsive e-mails and calendar entries from May 1, 2015 through January 21, 2017. Counsel shall confer to identify a list of reasonable search terms and to settle on a format in which the e-mails and calendar entries should be produced. In all other respects, Defendants' request for the disputed e-mails and calendar entries is denied.

c. Commissions Spreadsheet

90. The third issue concerns a spreadsheet in which Addison Whitney calculated unpaid commissions owed to Budd, Cashion, Cuykendall, and Scott at the time of their resignations. (*See* Defs.' Mem. Supp. 18–19; Defs.' Mot. Compel Ex. 5 at 12.)

This document is tied to Defendants' counterclaim under the North Carolina Wage and Hour Act. Addison Whitney does not contest relevance but asserts work-product immunity and attorney-client privilege. (*See* Pl.'s Opp'n 9–11.)

91. The disputed spreadsheet is not protected work product. It was not "prepared in anticipation of litigation or for trial," which is an essential ingredient of work-product immunity. N.C. R. Civ. P. 26(b)(3). Rather, it was prepared as part of Addison Whitney's standard offboarding process for departing employees. The spreadsheet's authors, Natasha Kempf and Rebecca McPhail, testified that they calculated the commissions owed to Budd, Cashion, Cuykendall, and Scott just as they had for others in the past. (*See* Dep. N. Kempf 139:18–21, 140:7–10, 141:2–11, ECF No. 187.7; Dep. R. McPhail 213:7–215:25, ECF No. 206.7.) Neither testified that the task was performed at the instruction of counsel or for a litigation-related purpose.

92. Addison Whitney insists that it was contemplating litigation at the time, but "even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of the litigation." *Cook v. Wake Cty. Hosp. Sys., Inc.*, 125 N.C. App. 618, 624, 482 S.E.2d 546, 551 (1997) (citation and emphasis omitted). Addison Whitney also submitted for *in camera* review several e-mails in which Kempf sought guidance from in-house counsel about the company's commission policy. The Court finds nothing in these communications to suggest that the spreadsheet was "prepared or obtained *because of* the prospect of litigation." *Id.* (emphasis added); *see also Isom*, 177 N.C. App. at

413, 628 S.E.2d at 463 ("And, it goes without saying that any otherwise business emails, copied to an attorney, are not protected by the work product doctrine solely due to the fact that they were sent during a time when the business is anticipating litigation."). Addison Whitney has not carried its burden to show that the spreadsheet is immune from discovery. *See Wachovia Bank*, 178 N.C. App. at 531–32, 631 S.E.2d at 882.

93. Neither has Addison Whitney carried its burden as to the attorney-client privilege. When Kempf and McPhail were asked about the spreadsheet during their depositions, no privilege objection was made. (*See* Dep. N. Kempf 139:18–21, 140:7–10, 141:2–11; Dep. R. McPhail 213:7–215:25.) Even now, Addison Whitney's point seems to be that Kempf or McPhail had other confidential communications (the *in camera* e-mails) about the commissions. (*See* Pl.'s Opp'n 10–11.) Defendants have not sought those e-mails. The spreadsheet itself does not appear to be a privileged communication, and Addison Whitney has not shown otherwise.

94. Accordingly, Addison Whitney shall produce the spreadsheet.

d. Personnel Files

95. Defendants next request the personnel files of more than twenty Addison Whitney employees. (*See* Defs.' Mot. Compel Ex. 6 at 27–28, ECF No. 192.1.) Addison Whitney objects on the grounds of privacy concerns and overbreadth. (*See* Pl.'s Opp'n 8–9.)

96. "[P]ersonnel files contain perhaps the most private information about an employee within the possession of an employer." *Whittingham v. Amherst Coll.*, 164

F.R.D. 124, 127 (D. Mass. 1995). For that reason, courts often refuse to compel their disclosure unless the files are clearly relevant and there is no less intrusive way to obtain the information. *See, e.g.*, *Armitage v. Biogen, Inc.*, 2019 U.S. Dist. LEXIS 253, at *16 (M.D.N.C. Jan. 2, 2019) (limiting discovery to files "of employees whose action or inaction has a direct bearing on the plaintiff's claims or defendant's affirmative defenses"); *James v. Peter Pan Transit Mgmt., Inc.*, 1999 U.S. Dist. LEXIS 2565, at *31–32 (E.D.N.C. Jan. 20, 1999) ("Personal privacy and the confidentiality of personnel files are important public policy concerns."); *Raddatz v. Standard Register Co.*, 177 F.R.D. 446, 447–48 (D. Minn. 1997) ("[T]he very act of disclosing an employee's sensitive and personal data is a highly, and frequently, an unnecessarily intrusive act . . . ."); *cf. Dahdal v. Thorn Americas, Inc.*, 1997 U.S. Dist. LEXIS 14792, at *4 (D. Kan. Sept. 15, 1997) ("To permit wide dissemination of personnel files would result in a clearly defined, serious, and unnecessary injury to the privacy of the employee who is not a party to the lawsuit.").

97.    Many, perhaps all, of the individuals named by Defendants are potential witnesses, but that alone does not make their personnel files fair game. There must be some connection between the information in the file and the asserted claims and defenses. The connection just isn't there. Defendants do not discuss any of the individuals by name or explain why their involvement merits full disclosure of their personnel files and all the sensitive information contained within. What Defendants seem most interested in are disciplinary policies and employment contracts. (*See* Defs.' Mem. Supp. 20.) There are far less invasive ways to obtain such things.

98.     Accordingly, the Court denies the request.

e. Business Assessment Report

99.     After Defendants resigned in January 2017, Addison Whitney performed an assessment of its business. Mark Dmytruk, the Chief of Staff for Addison Whitney's parent company, investigated matters and prepared a written report. Addison Whitney contends that the report is protected work product.

100.     In their BCR 10.9 summary and their opening brief, Defendants did not challenge the assertion of work product but instead asked the Court to compel Addison Whitney "to produce the factual information that it gleaned from the investigation in question." (Defs.' Mem. Supp. 21.) On that point, there is nothing to compel. Counsel for Addison Whitney represented that it has never objected to discovery of the facts underlying the report or tried to stop Defendants from deposing Dmytruk.

101.     For the first time in the reply brief, Defendants asked for the report itself and argued that it is not protected work product. (*See* Defs.' Reply Br. 7–8, ECF No. 215.) This argument is tardy. Even if it weren't, the Court concludes after *in camera* review that the assessment report is protected work product. The circumstances show that the report was prepared in anticipation of litigation. It was delivered to counsel and states that it was prepared for counsel; nothing suggests that Dmytruk would have prepared this type of report in the ordinary course of his duties. Moreover, Defendants cannot show that they are "unable without undue hardship to obtain the substantial equivalent of the materials by other means" because, at least

at the time of the hearing, they had not deposed Dmytruk about the facts underlying the report.  N.C. R. Civ. P. 26(b)(3).

102.  In short, Defendants are free to depose Dmytruk.  The Court denies their request for his report.

f. Google AdWords Campaigns

103.  The next issue relates to Addison Whitney's experience with Google AdWords.  Addison Whitney agreed to produce documents related to its May 2017 AdWords campaign, which is the subject of Defendants' defamation counterclaim.  But it has refused, on relevance grounds, to produce documents related to other AdWords campaigns dating back to 2011.  (*See* Pl.'s Opp'n 12–13.)  Defendants ask the Court to compel a response.  (*See* Defs.' Mem. Supp. 21–22.)[6]

104.  The Court agrees with Addison Whitney.  The earlier campaigns are not a basis for the defamation counterclaim.  Defendants do not even sketch out the supposed relevance of the content of those campaigns, arguing instead that they are entitled to know Addison Whitney's "processes for choosing words and identifying target audiences" when using AdWords.  (Defs.' Mem Supp. 22.)  Perhaps it is relevant how Addison Whitney chose terms and identified the audience for the May 2017 campaign.  But it is not relevant how Addison Whitney did so for campaigns on other topics at different times.  This request is denied.

---

[6] This discovery request is not in the record, but there is no dispute that the request and Addison Whitney's objections to it were properly served.

g. 30(b)(6) Deposition Notice

105. "It is not literally possible to depose a corporation. Instead, information from a corporation must be sought from natural persons who can speak on behalf of the corporation." *Hooker v. Norfolk S. Ry. Co.*, 204 F.R.D. 124, 125 (S.D. Ind. 2001); *accord Littlefield v. NutriBullet, L.L.C.*, 2017 U.S. Dist. LEXIS 222836, at *20 (C.D. Cal. Nov. 3, 2017). This is the purpose of Rule 30(b)(6), which allows a party to name a corporation or similar organization as a deponent. The party seeking discovery must "describe with reasonable particularity the matters on which examination is requested." N.C. R. Civ. P. 30(b)(6). In turn, the responding organization must "designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which he will testify." *Id.*

106. "The effect of the rule is to place upon the business entity the burden of identifying witnesses who possess knowledge responsive to subjects requested in the Rule 30(b)(6) request." *Hooker*, 204 F.R.D. at 126. The entity has the duty not only to provide knowledgeable witnesses but also to educate the witnesses if they do not have personal knowledge of the designated subjects. *See, e.g.*, *Great Am. Ins. Co. of N.Y. v. Vegas Constr. Co.*, 251 F.R.D. 534, 539 (D. Nev. 2008). Their testimony, after all, "represents the knowledge of the corporation, not of the individual deponents." *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996). And their answers "are binding on the corporation." *Littlefield*, 2017 U.S. Dist. LEXIS 222836, at *20–21.

107. That said, a 30(b)(6) deposition should not be a "memory contest." *E.g.*, *Jenkins v. XpresSpa Grp., Inc.*, 2020 U.S. Dist. LEXIS 58724, at *12 (S.D.N.Y. Apr. 2, 2020) (citation and quotation marks omitted); *Great Am. Ins. Co. of N.Y.*, 251 F.R.D. at 539. Overbroad and unduly burdensome deposition topics are subject to court oversight just as any other form of discovery would be. As one court recently put it, "an overbroad 30(b)(6) notice 'subjects the noticed party to an impossible task' and therefore will not be allowed." *Crocs, Inc. v. Effervescent, Inc.*, 2017 U.S. Dist. LEXIS 221098, at *8 (D. Colo. Jan. 3, 2017) (quoting *Cotton v. Costco Wholesale Corp.*, 2013 U.S. Dist. LEXIS 103367, at *2 (D. Kan. July 24, 2013)).

108. Defendants served Addison Whitney with a notice of deposition that listed twenty-eight topics. (*See* Defs.' Mot. Compel Ex. 1, ECF No. 194.1.) Addison Whitney objected and refused to designate corporate witnesses for all but five. (*See* Defs.' Mot. Compel Ex. 3, ECF No. 194.3.) For efficiency and clarity, the Court groups the topics by subject matter or objection, as needed.

109. <u>Topics 1, 2, 6, 12–15, 28</u>. The first set of topics covers all facts underlying Addison Whitney's contentions that Defendants misappropriated trade secrets and confidential information, breached their fiduciary duties, and unlawfully diverted corporate opportunities, among other things. (*See* Defs.' Mot. Compel Ex. 1 at 5–7, 9.) Addison Whitney objects that it could not adequately prepare witnesses to testify about these topics. (*See* Pl.'s Opp'n 15–17.) It also claims that contentions should be the subject of interrogatories, rather than a 30(b)(6) deposition. (*See* Pl.'s Opp'n 15–16.)

110. Federal district courts are divided in their approaches to "contention" 30(b)(6) topics. Some courts treat them favorably. *See, e.g.*, *Landry v. Swire Oilfield Servs., L.L.C.*, 323 F.R.D. 360, 384–85 (D.N.M. 2018); *Majestic Bldg. Maint., Inc. v. Huntington Bancshares, Inc.*, 2018 U.S. Dist. LEXIS 114267, at *16 (S.D. Ohio July 10, 2018) ("Courts have consistently held 'that a Rule 30(b)(6) notice of deposition that seeks the factual bases for another party's claims or defenses is proper.'" (quoting *Smith v. Gen. Mills, Inc.*, 2006 U.S. Dist. LEXIS 19093, at *8 (S.D. Ohio Apr. 13, 2006))).

111. Most courts take a more restrictive view. One reason is that other discovery tools, especially interrogatories, are better suited to explore an opponent's legal theories. *See, e.g.*, *Cx Reinsurance Co. v. B&R Mgmt., Inc.*, 2018 U.S. Dist. LEXIS 56386, at *11 (D. Md. Apr. 3, 2018); *JPMorgan Chase Bank ex rel. Mahonia Ltd. v. Liberty Mut. Ins. Co.*, 209 F.R.D. 361, 362 (S.D.N.Y. 2002). Another reason is that it may be unreasonable to expect a witness, even an educated witness, to be prepared to testify about all facts underlying a given claim. *See, e.g.*, *Lenox Maclaren Surgical Corp. v. Medtronic, Inc.*, 2015 U.S. Dist. LEXIS 75813, at *15 (D. Colo. June 11, 2015); *Castillon v. Corr. Corp. of Am.*, 2014 U.S. Dist. LEXIS 124509, at *4–5 (D. Idaho Sept. 2, 2014); *In re Indep. Serv. Orgs. Antitrust Litig.*, 168 F.R.D. 651, 654 (D. Kan. 1996).

112. There is no need to choose one approach over the other in this case. By any standard, Defendants' topics are unduly burdensome. Taken together, these topics would require Addison Whitney to prepare one or more witnesses to testify about "[a]ll facts" and "[a]ll evidence" that support more than half a dozen claims and

defenses. (*E.g.*, Defs.' Mot. Compel Ex. 1 at 5.) That is impracticable. The obligation to make a good-faith effort to produce knowledgeable witnesses "becomes less realistic and increasingly impossible as the number and breadth of noticed subject areas expand." *Apple Inc. v. Samsung Elecs. Co.*, 2012 U.S. Dist. LEXIS 9921, at \*13 (N.D. Cal. Jan. 27, 2012); *see also id.* (observing that Rule 30(b)(6) "does not extend to burdening the responding party with production and preparation of a witness on every facet of the litigation"). Thus, the Court will not compel Addison Whitney to designate a witness for topics 1, 2, 6, 12–15, and 28.

113. Defendants have expressed concern that Addison Whitney's responses to contention interrogatories were vague and lacked detail. No motion has been filed on that issue, but Addison Whitney has offered to supplement its responses as a compromise. Counsel should confer and agree to a date certain for the amended responses.

114. Topics 3–5, 7, 23–27. These nine topics cover a range of matters: evaluations of Cashion's job performance in 2015 and 2016 (topic 3); employment contracts offered to Cashion (topic 4); a 2016 corporate resolution (topic 5); Defendants' time sheets in the year before their resignations (topic 7); the May 2017 press release and AdWords campaign (topics 23–26); and Addison Whitney's calculation of commissions owed to certain Defendants (topic 27). (*See* Defs.' Mot. Compel Ex. 1 at 5, 6, 8.) Addison Whitney objects that each topic is duplicative of other discovery, including deposition testimony of individual fact witnesses. (*See* Pl.'s Opp'n 17–18.)

115. This is a common objection, often overruled. Ordinarily, a 30(b)(6) deposition is not "unnecessary or cumulative simply because individual deponents— usually former or current employees of the entity whose Rule 30(b)(6) deposition is sought—have already testified about the topics noticed in the Rule 30(b)(6) deposition notice." *La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, 285 F.R.D. 481, 487 (N.D. Cal. 2012) (collecting cases). Indeed, "[c]orporate designees are commonly produced, and no doubt some of their testimony may be a re-hash of what's been covered elsewhere, but their testimony is the testimony of the corporation itself, and for that reason alone it may not be duplicative." *Appleton Papers Inc. v. George A. Whiting Paper Co.*, 2009 U.S. Dist. LEXIS 111768, at *11 (E.D. Wis. Sept. 2, 2009).[7]

116. Here, the Court sees no evidence of abuse or overreaching. Defendants are entitled to have binding answers from Addison Whitney on these topics even if the designee's testimony ends up being more or less the same as that of earlier witnesses (or if one of the earlier witnesses is named as the 30(b)(6) designee). Accordingly, Addison Whitney must produce a corporate representative to testify as to topics 3–5,

---

[7] *See also, e.g.*, *Edwards v. Scripps Media, Inc.*, 331 F.R.D. 116, 122 (E.D. Mich. 2019) ("[T]he prior testimony from the individual fact witnesses does not relieve defendant from its obligation to designate a witness under Rule 30(b)(6)[.]"); *FDIC v. Giancola*, 2015 U.S. Dist. LEXIS 125229, at *11 (N.D. Ill. Sept. 18, 2015) (reasoning that "substantial other discovery" did "not render a Rule 30(b)(6) deposition duplicative"); *New Jersey v. Sprint Corp.*, 2010 U.S. Dist. LEXIS 14890, at *9–10 (D. Kan. Feb. 19, 2010) ("Even if the substance of the information ultimately provided mirrors that of the testimony given by Sprint's former directors and employees, plaintiff still is entitled to tie down the definitive positions of Sprint itself, rather than that of the individuals who work for Sprint."); *Dongguk Univ. v. Yale Univ.*, 270 F.R.D. 70, 78 (D. Conn. 2010) (allowing 30(b)(6) deposition even though duplicative); *Tri-State Hosp. Supply Corp. v. United States*, 226 F.R.D. 118, 125–26 (D.D.C. 2005) (reasoning that there is "no principle of law that precludes a party from pursuing during a deposition a topic about which it has already received information via other discovery devices").

7, and 23–27. *See Duke Energy Carolinas, LLC v. AG Ins. SA/NV*, 2019 NCBC LEXIS 75, at *11 (N.C. Super. Ct. Nov. 22, 2019) (allowing 30(b)(6) deposition because "the record does not reflect that corporate positions, intentions, and reasons, rather than the actions and understandings of individual corporate employees, were topics of inquiry at the depositions taken to date").

117. <u>Topics 16–18, 21</u>. Four topics address the changes that Addison Whitney made to its practices and policies for handling confidential and proprietary information after Defendants resigned. (*See* Defs.' Mot. Compel Ex. 1 at 7.) Addison Whitney objects that these topics seek information about subsequent remedial measures, which is forbidden by Rule 407 of the North Carolina Rules of Evidence. (*See* Pl.'s Opp'n 18.)

118. This objection "is inapt. Rule 407 governs admissibility. It does not preclude discovery." *Granberry v. Jet Blue Airways*, 228 F.R.D. 647, 651 n.2 (N.D. Cal. 2005) (discussing analogous federal Rule 407); *see also Laws v. Stevens Transp., Inc.*, 2013 U.S. Dist. LEXIS 32221, at *8–9 (S.D. Ohio Mar. 8, 2013) (observing that federal Rule 407 "governs the admissibility of evidence and does not control pretrial discovery"). If information about subsequent remedial measures is reasonably calculated to lead to the discovery of admissible evidence, then it is relevant and discoverable, even if Rule 407 later bars admissibility at trial. *See, e.g., Venator v. Interstate Res., Inc.*, 2015 U.S. Dist. LEXIS 146891, at *10–12 (S.D. Ga. Oct. 29, 2015); *Bernat v. City of Cal. City*, 2010 U.S. Dist. LEXIS 111538, at *13–14 (E.D. Cal. Oct. 12, 2010); *Stalling*

*v. Union Pac. R.R. Co.*, 2003 U.S. Dist. LEXIS 9550, at \*29–30 (N.D. Ill. June 6, 2003); *Miner v. Kendall*, 1996 U.S. Dist. LEXIS 18801, at \*3–4 (D. Kan. Sept. 27, 1996).

119. At this stage, the Court is satisfied that these topics are reasonably calculated to lead to the discovery of admissible evidence. It would be speculative to guess what the testimony will be and how Defendants might use it later. Among other things, testimony about these measures could serve as impeachment evidence or help demonstrate the "feasibility of precautionary measures," both of which are exempt from Rule 407. N.C. R. Evid. 407. Addison Whitney must produce a designee to address topics 16–18 and 21.

120. <u>Topic 20</u>. This topic states as follows: "Details regarding Plaintiff's compiling and maintaining information regarding its competitors, and the specific types of information Plaintiff has collected and saved regarding its competitors, including the contents of a folder on the Plaintiff's computer servers containing such information, and the means by which Plaintiff has obtained or received such information, and the current status of such folder and information." (Defs.' Mot. Compel Ex. 1 at 7.) Addison Whitney objects to the relevance. The Court sustains the objection because the topic addresses all competitor research whether or not it has anything to do with the specific trade secrets at issue. The Court will not compel Addison Whitney to produce a witness for this topic.

121. <u>Topic 19</u>. This topic covers "[d]etails regarding the contents" of the assessment report prepared by Dmytruk. (Defs.' Mot. Compel Ex. 1 at 7; *see also* Defs.' Mem. Supp. 14.) Addison Whitney again asserts work-product immunity. (*See*

Pl.'s Opp'n 19.) As the Court recently explained, however, "the facts contained within work product remain discoverable even when the document itself is protected." *Kelley*, 2019 NCBC LEXIS 84, at \*48 (citing *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 n.5 (4th Cir. 1992)); *see also In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1240 (5th Cir. 1982) (observing that "the work product immunity protects only the documents themselves and not the underlying facts"). The Court overrules the objection, and Addison Whitney must designate a witness to address topic 19.

### III.
### CONCLUSION

122. For these reasons, the Court, in the exercise of its discretion, **GRANTS** in part and **DENIES** in part Addison Whitney's motion for contempt against Miller. To be clear, the Court does not hold Miller in contempt. Rather, the Court **ORDERS** Miller to appear for a deposition and to produce documents responsive to request numbers 1 through 7 and 9, as modified above, all on or before July 15, 2020. By the same date, Miller shall also produce a privilege log, consistent with the requirements of the case management order, for any documents that Defendants contend to be privileged and outside the scope of the subject matter waiver discussed above. Counsel shall work together to identify a mutually agreeable date and location for the deposition. In all other aspects, Addison Whitney's motion for contempt against Miller is **DENIED**.

123. The Court **GRANTS** in part and **DENIES** in part Addison Whitney's second motion to compel. The Court **ORDERS** as follows:

a. Defendants shall revisit their production of text messages. If Defendants find messages that were inadvertently withheld, the messages should be produced along with an explanation of how they were recovered. On the other hand, if Defendants find nothing more, they must explain whether and under what circumstances the messages were deleted.

b. Leaderboard Branding shall produce an updated profit and loss statement and its QuickBooks file.

c. Defendants shall revise the privilege logs identified in exhibit 24 to Addison Whitney's second motion to compel so that they comply with the case management order in all respects.

d. Defendants shall produce documents responsive to Addison Whitney's fourth requests for production.

e. These matters shall be completed on or before July 15, 2020.

f. In all other aspects, Addison Whitney's second motion to compel is **DENIED**.

124. The Court **GRANTS** in part and **DENIES** in part Defendants' motion to compel. The Court **ORDERS** as follows:

a. Addison Whitney shall produce e-mails and calendar entries, for the period from May 1, 2015 through January 21, 2017, that reside on computers issued to Defendants during their employment with the company. Counsel shall confer to determine a list of reasonable search terms and method of production.

b.    Addison Whitney shall produce the spreadsheets prepared by Kempf and McPhail to calculate commissions possibly owed to Budd, Cashion, Cuykendall, and Scott.

c.    Addison Whitney shall designate one or more witnesses for topics 3–5, 7, 16–19, 21, and 23–27 in Defendants' Rule 30(b)(6) notice.  Counsel shall work together to identify a mutually agreeable date and location for the deposition.

d.    These matters shall be completed on or before July 15, 2020.

e.    In all other respects, Defendants' motion to compel is **DENIED**.

125.  All parties shall bear their own costs and fees.  For each motion, the Court granted some relief and denied other requests so that neither side can be said to have prevailed more than the other.  It would be unjust to award expenses.  *See* N.C. R. Civ. P. 37(a)(4) (allowing denial of fees when court concludes that "circumstances make an award of expenses unjust"); N.C. R. Civ. P. 45(e)(2) (allowing fee award if objection is "unreasonable" or "made for improper purposes").

126.  At an earlier stage, the Court stated that the discovery period would close within two weeks of any order on these motions.  On second thought, and in view of the restrictions imposed during the ongoing COVID-19 pandemic, the Court **ORDERS** that the close of discovery shall be July 31, 2020.  Requests for extensions will not be favored, and each side is responsible for ensuring that it can complete discovery within this time period.  *See* BCR 10.4(a).

127.  The parties shall file any postdiscovery dispositive motions no later than September 14, 2020.  Response and reply briefs shall be governed by BCR 7.8.

**SO ORDERED**, this the 10th day of June, 2020.

                                /s/ Adam M. Conrad                 
                                Adam M. Conrad
                                Special Superior Court Judge
                                 for Complex Business Cases